[No. 828.   Decided June 30, 1893.]

HANNAH MORGAN *et al.*, *Respondents*, v. CARBON HILL COAL COMPANY, *Appellant*.

NEGLIGENCE — COAL MINING — VENTILATING MACHINERY — FELLOW SERVANTS — CONTRIBUTORY NEGLIGENCE — NON-SUIT.

The fact that a coal mining company had stopped its ventilating machinery from Saturday night until Sunday night does not constitute negligence when coupled with the fact that the machinery had been started and continuously run for a period of twelve or fourteen hours before an explosion of gas occurred on Monday morning.   (DUNBAR, C. J., dissents.)

A "fire boss" in a coal mine, whose duty it is to direct the men to leave the place where they are working and go to another place

37—6 WASH.

if, in his opinion, continuance at work in such place is dangerous, but who has no control of the action of the miners in the prosecution of their work, does not stand in the position of a vice principal. (DUNBAR, C. J., dissents.)

Where a miner assured a "fire boss" about to test the air in a gangway in a mine that there was no gas there, and the "fire boss" resting upon such assurance opened his lamp to light his pipe, and an explosion ensued, killing the miner, such remark on the part of the miner amounted to contributory negligence.

Although a defendant may go into his defense after the denial of his motion for a non-suit, he is entitled to the benefit of such motion if, at the time the proofs are finally closed, they are not sufficient to establish a *prima facie* case for the plaintiffs.

*Appeal from Superior Court, Pierce County.*

*Judson & Sharpstein,* for appellant.

*R. P. Daniels, Hudson & Holt,* and *J. S. Whitehouse,* for respondents.

The opinion of the court was delivered by

HOYT, J.—The motion for non-suit made by the defendant at the close of the plaintiffs' case should have been granted. At that time there was absolutely no proof tending to show any negligence on the part of the company. On the contrary it affirmatively appeared from such proof that the company had taken every precaution required by law and custom to protect its employés while working in the mine. And as it is not claimed that the company is a guarantor of the safety of its employés while so working, there could be no liability in the absence of some negligence on its part. The only acts, excepting those of an employé by the name of Jones, claimed by the respondents to have shown negligence on the part of the company, was that of the stoppage of the ventilating machinery from Saturday night until Sunday night preceding the accident, which occurred on Monday morning at about 9 o'clock. But there is no proof whatever in the record tending to show that

such stoppage of the machinery during such interval, when coupled with the fact of its being started and continuously run for a period of twelve or fourteen hours before the time of the accident, was in any manner an act of negligence on the part of the company.

As to the acts of the employé Jones we think the proof does not show that at the time of the accident he stood in the relation to the deceased of a vice principal of the company. We are satisfied with what was said by us in the opinion in the case of *Sayward v. Carlson*, 1 Wash. 29 (23 Pac. Rep. 830), but we do not think that under the definition of a vice-principal therein given, Jones occupied such a relation to the company. He had by virtue of his employment no right to control the action of the miners in the ·prosecution· of their work. Such control was vested in another employé of the company known as the ''inside boss.'' The only control, if any, that Jones, as ''fire boss,'' had of the men was to direct them to leave the place where they were working, and go to another place if their continuance at work in the first place was in his opinion dangerous; but even if we assume that in determining that question and directing the employés by virtue of the authority so given him he would be acting as a vice principal, ·it does not follow that at the time of the accident he was engaged in the duty required of him as such vice principal. In the situation in which he found the deceased party and the witness Williams, and while they were together up to the time of the accident, he had by virtue of his duties as ''fire boss'' no right whatever to control their action. Consequently, at that time he did not stand in any such relation to them as would make the company responsible for his acts.

Besides, it clearly appeared that if said Jones was guilty of such negligence as occasioned the accident, the deceased party was guilty of contributory negligence. If any one

had any reason to suspect the presence of dangerous gases at the point where they were, he had under the proof the same reason to suspect its presence. If he did suspect such to be the fact his remaining in that spot for the time he did, engaged in conversation having no reference to the prosecution of the work of the mine, was in itself an act of negligence on his part. If he did entertain such suspicion there is no reason to suppose that Jones did, and in its absence what he did would not necessarily show negligence on his. part.

Further, we think it appears affirmatively from the proofs offered on the part of the plaintiffs that deceased actively contributed to the act of Jones, which, it is claimed, led to the accident, by the remark which he made to him just before the explosion occurred. The only reasonable explanation of the action of Jones when he commenced to get up with his lamp above his head is that it was his intention to test the air close to the roof of the passage for the purpose of ascertaining whether or not there was any gas in that locality, and his reply to the remark at that time made to him by the deceased shows that he rested upon the assurance of the deceased that there was no gas there, and that for that reason he could safely open his lamp for the purpose of lighting his pipe without making any further investigation.

On each of the grounds, then — ( 1 ) That there was no sufficient proof tending to establish negligence on the part of the company; ( 2 ) that if such negligence was shown it affirmatively appeared from the proofs that the deceased contributed thereto — the plaintiff had failed to make a case against the defendant, and the motion for a non-suit should have been granted, and whatever may be held as to the effect upon such motion of the defendant going into its defense, it is clear that it is entitled to the benefit of such motion if, at the time the proofs are finally closed, they

are not sufficient to establish a *prima facie* case of liability to the plaintiffs.

After a careful examination of all the proofs in the record we are unable to find anything which could in any manner aid the plaintiffs' case. The judgment must be reversed, and the cause remanded with instructions to grant the non-suit, as moved for by the defendant.

STILES and ANDERS, JJ., concur.

SCOTT, J., concurs in the result.

DUNBAR, C. J. (*dissenting*). — I dissent. I think in the first place that the negligence of the respondent was clearly proven. Not only the statutory law but the common law and the law of common justice imposed upon the respondent the duty of protecting its employés from any danger which prudence could prevent.

The testimony shows that the ventilating fan which forced the air into the mine, and which air found egress by passing through the gangway, had not been operated from Saturday evening until Sunday night immediately preceding the explosion Monday morning. It is clear to my mind that if this fan had been kept in constant operation, the gangway in which the plaintiff stood at the time of the accident would have been clear of gas, and the explosion could not have occurred. The duty of the company did not end with operating this fan six days in the week; its duty was to operate it as long as it was necessary to properly ventilate the mine.

There is a weak attempt to make it appear that it was necessary to stop the fan one day out of seven for repairs; but the testimony absolutely fails on this point, and would not amount to a defense if it were true; for if it becomes necessary to stop a fan for twenty-four hours for repairs, the work must stop until such repairs are made and the mine again made safe for occupancy by the miners. The

mine *must* be kept ventilated at all hazards. I do not mean, of course, that the mine owners are absolute insurers or that they should be held responsible for unavoidable accidents which no human wisdom can perceive, or for accidents which the highest degree of human skill or caution cannot avert; but I do say that the commodity of simple convenience, or additional gain or profit, must not be put in the scale to weigh against the safety, health or lives of the operators.

It is a well established principle of law, based on plain common sense, that the care demanded of the employer must be adequate to the nature of the business and the employment; the more dangerous the employment, the greater the degree of care demanded. It needs no testimony to bring the fact to the attention of the court that coal mining is an exceedingly dangerous business; it is a matter of common knowledge forced upon the mind of every person of ordinary intelligence by the too frequent occurrence of appalling disasters, so horrible in their details and so direful in their effects that their mere contemplation, even by strangers who are not directly affected, is sickening in the extreme. In a business, then, where such results are possible, the very highest degree of care must be exerted, and every means and every precaution looking towards the prevention of these disasters must be rigidly employed. The legislature, not only of this state but of nearly every state in the Union where coal mines are operated, have taken legislative notice of the extraordinary perils and dangers incident to this character of business and have passed the most stringent laws for the protection of the lives of the operators, and the courts ought not to relax the rule prescribed by the legislative department. It also appears plainly to me that Jones, the fire boss, was guilty of gross negligence in not testing the gangway before he opened his lamp which caused the explosion. It cannot but

be admitted in this case that Jones was negligent; but the defense is, that he was a fellow servant of Morgan's, and, therefore, the company is not responsible for his negligence. This doctrine of "fellow servants" has, in my humble judgment, been carried to a ridiculous extreme by the courts, and they have been too quick to aid employers in escaping from responsibilities which every principle of justice demands they should respond to. This rule is a modern one in our jurisprudence, and is founded on the theory that the employé takes the risk of the negligence of his fellow-servant when he accepts the employment; but why he should be supposed to have contracted with reference to the acceptance of this risk any more than a risk incident to defective machinery or many other risks incident to his employment, I have not been able to ascertain, though many attempts have been made by courts and text writers to explain it. One of the reasons most often quoted in sustaining this rule is that announced by Chief Justice SHAW in *Farwell v. Boston, etc., R. R. Corporation,* 4 Metc. 49:

"Where several persons are employed in the conduct of one common enterprise or undertaking, and the safety of each depends much on the care and skill with which each other shall perform his appropriate duty, each is an observer of the conduct of the others, can give notice of any misconduct, incapacity or neglect of duty, and leave the service, if the common employer will not take such precautions, and employ such agents as the safety of the whole party may require. By these means, the safety of each will be much more effectually secured than could be done by a resort to the common employer for an indemnity in case of loss by the negligence of each other."

The reasons given here, it seems to me, would apply equally as well to any other risk. The employé could as well leave the employment in any case where, in his judgment, the employer did not take such precautions as the

safety of all parties required.    The trouble with this doctrine is that it does not take into consideration the very essential and controlling fact, that the workman is made responsible for the conduct of a person whom he does not employ and over whom he can exercise no authority or control whatever; he can neither employ, discharge or direct; all that is left for him, according to the doctrine of the learned judge, is to become a spy upon the action of his fellow servant, and reporter of his delinquencies; and in ninety-nine cases out of one hundred he knows nothing about the neglect of his co-laborer until the accident has occurred, and it is too late to complain.    On the other hand, every established principle of agency enters into the relation between the master and the servant whose neglect precipitates the accident and is the cause of the damage. In the first place, the service is rendered for the benefit of the master; he is the recipient of the profits accruing from such service; he employs the servant and pays him for the service rendered; he can discharge him at will; he can advise, direct and absolutely control him in the performance of his duty; it is he who examines the servant when he applies for the position, and he alone who has the opportunity or right to inquire into or pass upon his qualifications.    Surely if the rule were founded, as it should be, on the expediency of placing the risk upon the party who can best guard against it, it takes but a limited intelligence to discern the fact that the master is the directing mind who controls the risk.    But all these universally received tests of agency are brushed aside before the nebulous theory that the servant impliedly agrees when he applies for work to take the risk of the neglect and unskillful acts of those with whom he is not acquainted, and over whose actions he has, and can have, no control, and this agreement, which he never made nor had any intention of making, is imported into his contract by the arbitrary authority of the courts

— a purely fictitious contract which exists only in the judi-
cial imagination.    Courts should approach the duty of im-
porting implications into contracts with great caution, lest
construction be supplanted by manufactury, and a contract
be made for the parties essentially different from the one
they made for themselves.

If the knowledge of the negligence of a fellow servant
can be brought home to the laborer, and in the face of a
known danger he proceeds with his employment, then, by
the same principle that governs in cases of apparent injury,
of course he should not recover, for every man should make
use of his ordinary faculties in protecting himself from in-
jury, and, if, seeing the danger, he sees fit to rush into it,
or obstinately or carelessly shuts his eyes when his duty is
to observe, he has no one to blame but himself, and must
suffer the consequence; but from every consideration of
justice I insist that no man should be held responsible for
the acts of those over whom he has no direction, authority
or control.    But diverse as opinions of courts are upon the
question of who are fellow servants, I think very few, if
any, have carried the doctrine to the extent that has been
announced by the majority opinion in this case.    Fellow
servants are they who are employed in a common occupa-
tion by a common master; and must, in my judgment,
have equal authority.    When one employed has authority
to direct and control another, the relation of fellow servant
cannot exist.    It is not only contrary to the plain and ob-
vious meaning of the expression, but it is repugnant to our
sense of justice, that a person should be held responsible
for the faults of one, not only whom he cannot control, but
who has authority to control and direct him, and to whose
judgment it is his duty to defer, and whose orders it is his
duty to obey; one who is employed by the master as an
agent because of superior qualifications, receiving better
wages on account of such superior qualifications, who stands

in the place of the master, especially commissioned to carry the will of the master into effect; in every sense an *alter ego*, or vice master.    In this case, Morgan, the common laborer, had not the same authority as Jones, the fire boss; Morgan was a common miner, and received the wages of a common miner, while Jones held the superior and more responsible position — a position which Morgan could not, in any probability, have attained to.    It was a position requiring a certain degree of technical knowledge, and while it may be that Morgan, when he applied for the position of miner, may be held to have contracted with reference to his qualifications as a competent miner, upon what principle of law or ethics can he be held to have contracted with reference to the qualifications of Jones, whose duties were entirely distinct?    He had as much right to rely on the duty of the master to furnish a fire boss who was qualified to rightly perform the duties of his office, as upon the duty of the master to furnish suitable and safe machinery.    It was the duty of the fire boss to inspect the mine for gas, and direct the men with reference to their work, as affected by the presence or absence of gas.    It was the duty of the men, of course, to submit to his direction.    Morgan had submitted to it and had gone into the gangway where he was directed; whether he was talking about the business of the mine or about his own private business, at the time of the accident, is of no consequence whatever.    He was rightfully in the place designated by the company, awaiting until his chute should be relieved of gas.

So far as any question of contributory negligence is concerned, the testimony is conflicting, and the jury have weighed the testimony and found there was not; and there being no undisputed facts which, as a matter of law, would constitute contributory negligence, I think the judgment should be affirmed.