[No. 577. Decided January 29, 1890.]

W. P. SAYWARD v. JOHN E. CARLSON.

PERSONAL INJURIES — CONTRIBUTORY NEGLIGENCE — FELLOW-SERVANT — VARIANCE — WAIVER OF OBJECTIONS TO JURISDICTION — PRACTICE.

Where judgment by default has been entered against a non-resident defendant, on service by publication and attachment of his

property, defendant's objections to the jurisdiction of the court, taken before entry of the default, are waived by his motion to open the default, which was not upon a special appearance, and by the subsequent filing of his answer.

In an action by a servant for injuries received through the negligence of his master, where the complaint alleges that the defendant left his work to go to the water-closet, and was injured while on the way there, and the proof shows that he was on his way to his work in the morning, but had not yet commenced to work, there is no material variance.

The evidence showed that plaintiff was employed in defendant's sawmill, and had been assigned to begin work at 8 o'clock, on an upper floor; that he arrived early, and went into the engine room across the open space from the mill to talk with the fireman, whence he afterwards went across the yard and alongside the mill, to the water-closet, being injured on the way by a timber thrown from a window of the mill. If he had gone directly to the room in which he was to work, and thence by the usual way to the closet, he would not have been injured. There was no rule prohibiting the men from going into the mill by the route adopted by plaintiff, nor requiring them to reach the second story by the front stairs. *Held*, that plaintiff was not guilty of contributory negligence.

Where the gist of the complaint is that the master has injured the servant, and the proof shows that plaintiff's injury was caused by the negligence of a fellow-servant, defendant may move for nonsuit, without having pleaded any other defense than the general denial.

A person employed as head carpenter in a saw-mill, to make repairs around the building and on vessels used in connection with the mill business, is the fellow-servant of a sawyer employed in the same mill.

*Error to District Court, King County.*

The facts are fully stated in the opinion.

*J. R. Lewis, B. F. Dennison,* and *W. Lair Hill,* for plaintiff in error.

The court had no jurisdiction of the defendant on the case made; defendant's appearance to the action afterward did not waive his right to question the jurisdiction in this court. *Harkness v. Hyde,* 98 U. S. 478-9; *Yesler v. Oglesbee,* 1 Wash. T. 605; *Bentz v. Eubanks,* 4 Pac. Rep. 271;

*Pennoyer v. Neff*, 95 U. S. 714; *Wald v. Wilson*, 2 Wash. T. 376.

The motion for nonsuit should have been granted. Carlson, Beaton, Hall and Boyd were fellow-servants. Cooley on Torts, p. 532–5, and notes; Whart. Neg. 229; Shearm. & Red. Neg. 100; 2 Thomp. Neg. 1026, 1028, 1034; *Buckley v. Gould, etc., Co.*, 14 Fed. Rep. 841; *Foster v. Minn., etc., Ry. Co.*, 14 Minn. 277; *L. V. Coal Co. v. Jones*, 86 Pa. St. 432 (2 Am. State Rep. 631); *Wright v. N. Y. C. R. R. Co.*, 25 N. Y. 564; *Kelley v. Belcher M. Co.* 3 Sawyer, 564–5; *Quincy Mining Co. v. Kitts*, 3 N. W. Rep. 240; *Brown v. Winona, etc., Ry. Co.*, 38 Am. Rep. 285-8; *Blake v. Maine, etc., Co.*, 70 Me. 60; *McAndrews v. Burns*, 39 N. J. 117; *Dillon v. U. P. R. R. Co.*, 3 Dill C. C. 332; *Holden v. Fitchburg R. R.*, 129 Mass. 268; *Albro v. Agawam Canal Co.*, 6 Cush. 75; *Armour v. Haker*, 111 U. S. 313; *Randell v. B. & O. R. R. Co.*, 109 U. S. 478; *Umbank v. Lake Shore R. R. Co.*, 83 Ind. 191; *Willis v. O. R. & N. Co.*, 11 Or. 157; 2 Am. and Eng. Cy. Law, 30, and note.

The English common law is the rule in this territory, so made by statute, Code Wash. T., ₰ 1, and the English rule as declared in *Priestly v. Fowler*, 3 Mees. & W. 1, remains to-day the common-law rule in that country. Whart. Neg. ₰ 230; Big. Torts, 688; 14 Fed. Rep. 841, note, citing L. R. 1 H. L. App. 326.

No actionable negligence was proved. Negligence must be affirmatively proved. Deering on Neg. 405, and cases; *Brown v. C. & B. St. Ry. Co.*, 49 Mich. 153; *Allen v. Willard*, 57 Pa. St. 374; *Lansing v. Stone*, 14 Abb. Pr. 199.

At the time of the accident, the plaintiff was not in the line of his duty. He was voluntarily and needlessly in a place of special danger. He was there for his own amusement and at his own risk. *Severy v. Nickerson*, 120 Mass. 306; *Wright v. Rawson*, 52 Iowa, 329; *Brown v. Byroads*,

47 Ind. 435; 92 Pa. St. 281; 28 Mich. 457; 111 Ill. 203; 45 Iowa, 546.

The plaintiff's voluntary act in going to the furnace room rendered the accident possible. His want of care and circumspection, in leaving the furnace room and taking the course he did, was the proximate cause of the injury. The defense may well rest on the sole ground of *contributory negligence.* 111 Pa. St. 9.

*N. Soderberg (J. L. Murphey,* of counsel), for defendant in error.

Defendant (being a non-resident) moved to open the default entered against him without limitation or reservation, and thus submitted himself to the jurisdiction of the court. No default can be opened by special appearance. If a party so far appears as to call into action the powers of the court for any purpose, except to decide on its own jurisdiction, it is a general appearance. *Clark v. Blackwell,* 7 Greene (Iowa), 722; *Whiting v. Bodd,* 5 Mo. 443.

There is no common service where one servant is employed in a separate and disconnected branch of the business from that in which the other is engaged. Deering, Neg. § 204; 39 N. J. L. 117; 78 Pa. St. 25.

The rule exempting the master from liability for negligence of his servants causing injury to other servants, only applies where there is a common business, so that the injured servant has an opportunity to exercise preventive care over his fellow-servants' negligence. And it does not apply so as to relieve a master from liability where a servant injured by the gross negligence of a co-servant. Deering, Neg. § 202; *Louisville R. R. Co. v. Robinson,* 4 Bush (Ky.), 507; *Chicago, etc., Co. v. Ross,* 112 U. S. 377; *Rolling Mill Co. v. Johnson,* 114 Ill. 57; *N. P. R. R. Co. v. Herbert,* 116 U. S. 642.

The opinion of the court was delivered by

STILES, J.—On the 29th day of March, 1885, the defendant in the court below was the proprietor of the Port Madison Mill, at Port Madison, Kitsap county. At the mill he carried on the business of manufacturing lumber, rough and dressed, and thence by means of schooners which he owned, he shipped the lumber to various ports of the Pacific ocean for market.

The mill premises consisted of an enclosed yard containing one or two acres, with gates for the entrance and exit of employés, as the business required. Inside of the yard, and occupying one side of it, was the mill proper, which was a two-story structure sixty or seventy feet in width and some three hundred feet long. In the second story were the saws and principal mill apparatus, the engines and planing machinery being on the floor below. The boiler house and carpenter shop were across an open area from the mill, distant fifty or sixty feet, but within the yard. Adjacent to the mill was a wharf, upon which lumber from the mill was run, and thence loaded into the vessels as they required cargoes.

At the date named, defendant, who himself resided at Victoria, B. C., had one Meigs employed at the Port Madison Mills as his general superintendent and manager. Meigs' authority was very full, so that some of the men who had worked in the mill for years supposed him to be the proprietor. But all hands were paid their wages by defendant's checks, signed by Meigs, "Agent."

Under Meigs, and next in authority, was one Bucklin, who was general foreman over all the work there carried on, and from whom the men in the mill, engine room, boiler room and log chute, and on the wharf, took their general orders; each gang of men, however, as a rule, having a sub-foreman, who was a laborer himself, and directed the work of those with him. At the date named there were about

3 — 1 WASH.

seventy-five men employed in and about the mill premises, in connection with the business of the defendant there carried on. Some had regular employment, in certain positions, as the engineer, the fireman, the head carpenter, the head sawyer, and perhaps some of the men in other places; while others had no regular employment, but were shifted from one place to another as occasion required their services. The plaintiff below, Carlson, was one of the last named class, and had been employed in the mill since December 8, 1833. During that time he had been tallyman on the wharf, trimmer, scantling sawyer, gang sawyer, hook tender, and tallyman in the mill. On Saturday, March 27th, he had been acting as tallyman in the mill, and at the close of work on that day was assigned by Bucklin to the scantling saw for the next Monday.

One Beaton was the head carpenter of the establishment, whose duty it was to attend to such carpentering as needed to be done about the premises, either alone or with such assistance as he required. Beaton had been for some time engaged in repairing the schooner Vidette, one of the defendant's vessels, which lay at or near the mill, and had occasion to use some ship's knees in connection therewith. There were ship's-knee timbers lying in the water at the mill, and on Saturday the log hauler for the mill drew up some of the timbers into the mill preparatory to being dressed by Beaton at the carpenter shop. The sawing of these timbers required peculiar handling, and Beaton, Bucklin, and some others, did the work at the mill-saw on Saturday after the regular work was over, leaving the sawed knees lying on the floor to be removed by Beaton. At that time the mill was running on three-quarter time, work commencing at eight o'clock in the morning. Carlson's time to begin work was, therefore, eight o'clock; but Beaton was working on full time, commencing at seven o'clock.

Between seven and eight o'clock on Monday morning,

Beaton and two other men, who were in general employ similar to Carlson's, but who at that time were detailed to assist the former, went into the mill to remove the ship's knees sawed the previous Sat` day to the carpenter shop.

There were a number `  ` knees, which were triangular timbers, weighing one or two hundred pounds each. There were means by which the knees could have been taken from the mill to the carpenter shop without any danger of injury to any person; but this would have involved carrying each one part of the length of the mill to the front end, down a stairway, and thence back the length of the mill to the shop.

A much nearer way was to take them to a window of a small room built out at the side of the mill, at the rear, and throw them to the ground, some 15 feet. The latter plan was adopted. Beaton recognized the fact that some person might be passing under the window, and might be injured by a falling knee; therefore, he directed the men who were about to throw out the first knee to call out warning to any one thus passing. His men looked out and called the warning and then dropped the knee. The plaintiff, Carlson, at that moment was passing under the projecting room where he could not see the window, nor the men see him, and he did not hear the warning; so, as he emerged from the overhanging room, he was struck by the falling knee and severely injured. This action was brought against the proprietor of the mill, Sayward, to recover damages for the injury, on the ground that it was the negligence of the defendant's servant, in throwing the knee from the window, that caused it.

The material allegations of the complaint here involved were as follows:

" That at all the times hereinafter mentioned plaintiff was employed by defendant as a workman in said saw-mill in the capacity of tallyman.

" That on the 29th day of March, A. D. 1885, the plain-

tiff, then being in the employ of defendant in the capacity of tallyman as aforesaid in said same saw-mill, having a necessity to go to the water-closet situate under saw-mill, left his work and went toward said water-closet by the way usually traveled by himself and other workmen employed by defendant in said saw-mill.

"That in going from his work to said water-closet by the way aforesaid, the plaintiff was compelled to pass directly under the fire-room of said saw-mill, and, while passing under said window, certain workmen employed by the defendant as carpenters, and there engaged in repairing the bark 'Vidette' near said mill, by the order and direction of the superintendent having charge and control of said carpenters for and in behalf of defendant, without giving any notice or warning whatever to this plaintiff, threw out of said window a ship's knee, weighing 400 pounds or more, and the same fell a distance of 16 feet, striking this plaintiff, who was then passing under said window as aforesaid, upon the head, arm and shoulder, severely bruising and wounding him, and rendering him senseless, and plaintiff remained in a state of insensibility for the space of ten hours, and was confined to his bed by reason of said injury for a period of one day.

"That said accident happened, and said injuries were received, wholly on account of the carelessness and negligence of the said superintendent having charge and control, for and in behalf of the defendant, of the carpenters employed by the defendant as aforesaid, and through no fault or negligence on part of plaintiff."

The defendant being a non-resident, plaintiff endeavored to obtain jurisdiction of his person and property by attaching the latter and making service of the summons by publication.

Numerous motions were made in the court below by the defendant's counsel, appearing specially therefor, for the purpose of preventing the court from assuming jurisdiction upon the attempted service made, and the denial of these motions is here assigned as error.

But whatever weight these motions may have had at the time, we are satisfied that a subsequent motion to open

a default which had been entered, which was not upon a limited or special appearance, as well as the subsequent answer, waived all objections to the jurisdiction, and brought the defendant fully before the court.

The answer of the defendant was a general denial.

The cause was tried upon the issues thus made, and there was a verdict and judgment for the plaintiff.

Upon the plaintiff resting his case, the defendant moved for a nonsuit and for a dismissal of the action upon the following grounds, viz.:

1. That the complaint did not state facts sufficient to constitute a cause of action.

2. That plaintiff had failed on the proofs to make out the cause of action stated in the complaint.

3. That, on the proofs, plaintiff's injuries were caused by his own negligence.

4. That, on the proofs, plaintiff's injuries were caused by a fellow-servant of plaintiff.

The court denied the motion, and error is assigned here upon the denial.   Upon these errors we are of the opinion:

1. That the complaint was sufficient.

2. The second ground of the motion was based upon the testimony which showed that plaintiff was injured while on his way to his work in the morning, and before he had commenced work for the defendant for the day, instead of under the circumstances alleged in the third and fourth paragraphs of his complaint, quoted above.   But we do not look upon the facts proven and those pleaded as materially varying.   The defendant could not have been surprised, and an amendment of the complaint to accord with the facts would have been allowed of course.

3. The third ground for nonsuit was taken in view of certain facts which we have not yet stated in full.   Plaintiff, as above set forth, was on Saturday assigned to go to work on the next Monday morning at eight o'clock, at the scantling saw in the second story, and near the front end

of the mill. The scantling saw was not far from the principal entrance to the second story, which was reached by broad steps from the ground, placed there for the accommodation of the mill men. Plaintiff's most natural and easy mode of reaching the place of his labor was up the steps and thence a few feet to his machine. But at some time between seven and eight o'clock plaintiff entered one of the mill-yard gates and went to the furnace room, across the open space from the mill, to have a social chat with the fireman, intending to go thence by another route to his work in time to begin at the hour.

At the rear, and on the ground floor of the mill, there were water-closets, built for the accommodation of the men, which were approached from the upper floor by a stairway at that end of the building. The most direct way to reach these closets from the furnace room was across the yard and under the mill; but for those at work on the upper floor the proper way was along the mill to the stair at the rear. At the house where plaintiff lived there was accommodation of the same kind which he could have used before going to the mill. But after remaining a short while in the furnace room, plaintiff decided to go to the mill closets and thence to his work, up the back stairs. He went across the yard, not in a direct line or path, but in such a course that he brought himself alongside the mill, so that in passing thence toward the back end and the closets, he walked under the projecting room where Beaton and the others were with the knees, coming out again from beneath the room at the precise moment when the first knee dropped and struck him. Had he visited the closet at his own house, or not gone to the furnace room, or walked in the most direct line across the yard to the mill closets, or taken his proper station in the mill and thence gone to the closet by the back stair, he would not have gotten under the overhanging room, and the injury would not have occurred.

In addition to this, it appeared that during the hours when the mill was running there were slab cars running back and forth through the yard in such a way as to make it dangerous for persons to be there; and that at all such times there was, at many places about the mill, more or less danger, so that persons employed there had to be constantly on the look-out.

Upon these facts the defendant urged that plaintiff had himself so contributed to his injury that he could not in any event recover; and it was contended, that as the nature of his employment did not at that time, or at any time, demand his presence at the furnace room, or in the yard, or anywhere except where his work for the moment was (to wit: that morning at the scantling machine, at eight o'clock), he was to be treated as a stranger who was trespassing without leave, and that he could not be excused by the plea of a necessity to visit the closets. But it was proven that no rule of the establishment prohibited the men from going into the mill by the route adopted by plaintiff, or required them to reach the second story by the front stair, and that many of them did, daily, go to and fro about the yard as he did. He reached the vicinity of the mill a few minutes early, the gates were open, and he did what, under the usual condition of things at that hour, he might have done without actual risk. Therefore, we cannot agree that his acts amounted to contributory negligence. Besides which, the testimony on that point fully warranted a submission of it to the jury, and we find no error in the motion for a nonsuit, on that ground.

4. Were Beaton and Carlson fellow-servants?

Plaintiff maintains that the defendant was not entitled to avail himself of that objection to a recovery unless he pleaded it in his answer, and that a general denial did not raise that issue. It may be, but we do not so decide, that the claim is correct when the objection is taken as a defense. But the gist of the complaint is, that the *master* has

injured the servant; therefore, when the plaintiff's proofs show that it is not the master, but some other person — a fellow-servant — who committed the wrong, there can be no affirmative judgment, and a motion for a nonsuit is the proper method of moving the court to a negative judgment.

The most earnest and learned efforts of counsel in this cause were directed to the enlightenment of the court upon the proper rules of decision for the determination of this question. It was agreed that if Beaton and Carlson were fellow-servants, there could be no recovery; but there was a radical difference as to the standard by which their relations were to be judged and declared. Plaintiff in error maintained that § 1 of the code of 1881, which makes the common law of England the rule of decision in all the courts of Washington Territory, was decisive as to the first step of the inquiry; namely, where the court should look for the proper rules. We agree to this. But we do not subscribe to the next proposition, that resort can be had only to the decisions of English courts, or to those of American courts which have followed them, to ascertain what the common law of England is or was, unless the English decisions commend themselves to reason, or have been so long and generally followed that to depart from them would tend to unsettle what has, by "immemorial and universal usage," been understood to be settled. The common law grew with society, not ahead of it. As society became more complex, and new demands were made upon the law by reason of new circumstances, the courts originally, in England, out of the storehouse of reason and good sense, declared the "common law." But since courts have had an existence in America they have never hesitated to take upon themselves the responsibility of saying what *is* the common law, notwithstanding current English decisions, especially upon questions involving new conditions. Therefore, we have the "common law" as declared by the highest courts

of this, that and the other state, and by the courts of the
United States, sometimes varying in each.  And we under-
stand, by § 1 of the code, that where there are no gov-
erning provisions of the written laws, the courts of the
late territory, and of this state, are, in all matters coming
before them, to endeavor to administer justice according to
the promptings of reason and common sense, which are the
cardinal principles of the common law; but not that the de-
cisions of the English courts are to be taken blindly and
without inquiry as to their reasoning or application to the
circumstances.  We have been led to these remarks be-
cause of the fact that this question of injuries by servants
of the same master negligently inflicted upon each other,
has given rise to extensive discussion and wide diver-
gence of decision in both English and American courts.

Up to a certain point, undoubtedly the common-law
rule was and is, that the master is not liable if one of his
servants negligently injure another.  It was indirectly
stated so to be in *Priestley v. Fowler,* 3 Mees. & W. 1, in
1837; but was first distinctly announced in *Murray v.
South Carolina R. R. Co.,* 1 McMul. 385, in 1841, and
was re-announced in Massachusetts in 1842, in *Farwell v.
Boston & Worcester R. R. Co.,* 4 Metc. 49.

The first positive announcement of the rule in England
was in *Hutchinson v. York, etc., Ry. Co.* 5 Exch. 343.
The theory of the South Carolina case was, that each of the
servants in his separate department represented the princi-
pal, and that they were engaged in a joint understaking.

In Massachusetts the ground of the decision was, that
by refusing a resort to the common employer the safety of
each employé would be more effectually secured, by reason
of the greater skill and care with which they would con-
duct their several operations.  *Hutchinson v. York, etc.,
Ry. Co.,* seems to have rested upon the conclusion of the
court that the principle of holding the master liable would
" carry us to an alarming extent."

The English cases down to this time, except as they have been restricted by statute, have been kept well up to the general rule, in which they have rather followed, than been followed by, many American cases, notably those decided in Massachusetts. See *Holden v. Fitchburg R. R. Co.*, 129 Mass. 268. But almost contemporaneously with the assertion of the general rule of the exemption of the master, other American courts refused adherence to it as a universal rule. The rise and progress of great railroad corporations, operating over long lines of road, with hundreds of employés, from president down, caused a closer inspection of the real relations of the men, who, although they were employed and paid by the same master, were often so widely separated in their spheres of duty that reason seemed to call for some substantial modification of the decisions as to what the rule really was, when applied to cases where there was so large a delegation of the authority of the master to the negligent servant, that the master could be said to be present and acting only in the person of the servant.

The courts of last resort of many of the states, and the supreme court of the United States, have given their adherence to this view, and according to their decision the "common law" of such cases is, that the rule of exemption to the master only applies when the negligent servant and the servant injured are in a "common employment."

The leading authority upon this subject, for this case at least, is the supreme court of the United States, which in *Chicago, etc., Ry. Co. v. Ross*, 112 U. S. 377 (5 Sup. Ct. Rep. 184), said: "There is in our judgment, a clear distinction to be made in their relation to their common principal, between servants of a corporation exercising no supervision over others engaged with them in the same employment, and agents of the corporation clothed with the control and management of a distinct department, in which their duty is entirely that of direction and superintendence;" and held a railroad conductor, who neglected to inform his engineer

of an order to wait at a station ahead for a train going in the opposite direction, whereby a collision occurred, not to be the fellow-servant of the engineer.

Other courts have applied the principle to far more complicated cases, and have not hesitated to give the employés of natural persons the benefit of the new "common law," the announcement of which was at first based upon that peculiarity of corporations which compels them to act by agents only; doubtless the United States supreme court would do the same in a proper case.

Yielding our adherence to the doctrine that to exempt the master and make the two servants fellow-servants, they must be engaged in the same common employment, in the same department of service, and act under the same immediate direction, we look vainly for any agreement among the courts as to what "common employments" are. The diversity of employments and myriad circumstances under which men act and are injured, make it impossible to define them. Some general definitions there are, and with them each case must be compared as it arises, and the rules extended so as to make a reasonable application.

We find in *Crispin v. Babbitt*, 81 N. Y. 516, what seems to us the most correct, brief statement of some of the points to be regarded in cases of this kind, which has come to our notice. The court said, p. 520: " The liability of the master does not depend upon the grade or rank of the employé whose negligence causes the injury. A superintendent of a factory, although having power to employ men, or represent the master in other respects, is, in the management of the machinery, a fellow servant of the other operatives. On the same principle, however low the grade or rank of the employé, the master is liable for injuries caused by him to another servant, if they result from the omission of some duty of the master, which he has confided to such inferior employé. . . . *Flike v. R. R. Co.*, 53 N. Y. 549. . . . The liability of the master is thus made to depend

upon the character of the act in the performance of which the injury arises, without regard to the rank of the employé performing it. If it is one pertaining to the duty the master owes to his servants, he is responsible to them for the manner of its performance. The converse of the proposition naturally follows. If the act is one which pertains only to the duty of an operative, the employé performing it is a mere servant, and the master, although liable to strangers, is not liable to a fellow-servant for its improper performance. Wood, Master and Servant, § 438."

These are flexible rules, in which the doctrine that the delegated duties and powers of the master make a servant, at times, the very master himself as to other servants, is the central feature; and they seem to us eminently just to both master and servant. They would fully sustain the decision in *Brodeur v. Valley Falls Co.* (Rhode Island), 17 Atl. Rep. 54, cited by plaintiff in error.

There a machine repairer in a cotton mill, while crossing a yard adjoining the mill, was killed by an empty barrel thrown from the fourth story by a negligent mill operative, and it was held that they were fellow-servants.

Under these rules, Bucklin, the foreman of the Port Madison mill, when on Saturday he assisted Beaton to saw the ship's knees, was the fellow-servant of Beaton, although ordinarily he might not have been so in any matter wherein was involved the matter of providing safe and sound machinery for the sawing of the knees, that being a duty due from Sayward, the performance of which was confided to Meigs and Bucklin. But had Bucklin there carelessly handled a knee so that Beaton had suffered injury therefrom, there would have been no wrong imputable to Sayward. And so, when we come to apply this law to Carlson and Beaton at the time of the former's injury, if Carlson was a servant at all, we are clearly led to hold that he was a fellow-servant with Beaton.

We are urged to the consideration that Beaton was a

ship carpenter, employed by Sayward to repair ships, and therefore in a different department of labor from that of defendant.

The complaint denominated him "superintendent having charge and control of carpenters" engaged in repairing the bark Vidette. But looking at the testimony offered to sustain that allegation, we do not find it sustained, but on the contrary, it clearly appeared from that testimony, as well as from that produced by the other side, that Beaton was simply the mill carpenter, employed to make repairs wherever needed about the establishment. Sometimes he had men working with him whose work he did superintend, but in the execution of the work he were only a fellow-servant with them.

At this unfortunate time his work was in making some repairs to the Vidette, his master's vessel, by which part of his business there carried on was prosecuted.

The repairs to the vessel were entirely consistent with Beaton's general occupation. He was still a "mill-hand" just as much as the fireman or the engineer. In fact, were we to seek a nice distinction, we might justly say, that the sawing of ship's knees was clearly within the line of the mill's work; that it made no difference that they were sawed for the Vidette; that, in sawing them, Beaton, for the time, became a mill sawyer; that, in removing the knee on Monday, he was merely a lumber shover; and that he did not become a carpenter until he got out of the mill and began carpenter's work.

But our decision is on broader grounds.

Here was a department of a business carried on by the aid of seventy-five or a hundred men, at a particular place, where no man had to go off the premises to perform his work.

The employés, from highest to lowest, must necessarily have soon become personally acquainted with each other;

and they knew there were dangers to be looked out for, and it is always among dangers the unexpected that happens.

The two recent cases in the Michigan supreme court, *Quincy Mining Co. v. Kitts*, 42 Mich. 34 (3 N. W. Rep. 240), and *Sell v. Lumber Co.*, 70 Mich. 479 (38 N. W. Rep. 451), are cases in which the facts are of the same general character as those at bar, and the conclusions were, in substance, identical with our own in this case. The defendant's motion for nonsuit and dismissal should have been granted by the court below.

For the error in not sustaining the motion, the judgment entered must be reversed.

Judgment reversed, with directions to the successor of the court which tried the cause to grant the nonsuit and dismiss the action.

ANDERS, C. J., and HOYT and SCOTT, JJ., concur.
DUNBAR, J., not sitting.