[No. 47503-2.   En Banc.   March 4, 1982.]

JOHN A. SENEAR, *Petitioner, v.* THE DAILY JOURNAL–AMERICAN, *Respondent.*

*Diamond & Sylvester,* by *Lyle L. Iversen,* for petitioner.

*Klingberg & Reitsch,* by *Gerry A. Reitsch* and *Davis, Wright, Todd, Riese & Jones,* by *P. Cameron DeVore* and *Daniel Waggoner,* for respondent.

DOLLIVER, J.—John A. Senear was business agent for Local 587 of the Amalgamated Transit Workers Union in King County. Late in 1977, the union was engaged in collective bargaining negotiations with Metro, a municipal corporation providing mass transit in King County. On January 2, 1978, the Daily Journal–American, a Bellevue newspaper, published a story which included an accusation by "one well–placed union source" that a "deal" had been made with Metro management to get the union "through the holiday season," which is the most effective time to strike. It was reported that two other "well–placed union sources" said Senear had personally encouraged sick–outs, despite his public statements to the contrary. The article also related that Senear had been accused privately by "union members" of making a deal with Metro in return for a management job once the contract negotiations had been completed.

On January 24, 1978, Senear instituted a libel action against the newspaper. The complaint alleged the article was published in reckless disregard of the truth and that the newspaper knew, or should have known, the statements were false. The answer alleged, among other defenses, that Senear was a "public figure" and the story was published without malice.

In the course of pretrial discovery, Senear served the newspaper with interrogatories seeking disclosure of the names of the "well–placed union sources" and of the union members referred to in the article. The newspaper named the three persons who had said that Senear had made a deal in return for a management job. It refused to reveal the identity of the "well–placed union source" who had alleged that a deal had been made to get "through the hol-

iday season." Likewise, the newspaper refused to reveal the names of the two "well–placed union sources" who said that Senear had personally encouraged sick–outs.

On motion of plaintiff, the trial court entered an order compelling the newspaper to answer the interrogatories on the ground "that the matter inquired into is not privileged". The Court of Appeals granted defendant's motion for discretionary review and stayed the trial court order. Subsequently, in a split decision, the court held that a journalist has a qualified privilege under the First Amendment against compulsory disclosure of confidential news sources in a civil action. The court enunciated several standards which trial courts must consider before ordering disclosure, vacated the order of the trial court, and remanded the cause for a hearing with entry of appropriate findings and orders. *Senear v. Daily Journal–American,* 27 Wn. App. 454, 618 P.2d 536 (1980). We granted Senear's petition for review.

We reach the same result as the Court of Appeals although for different reasons. Also, as did the Court of Appeals, we confine the qualified privilege to civil cases. We do not here decide whether it applies in criminal prosecutions.

A qualified privilege may be based on the constitution, a statute or on common law. While a number of states have accorded reporters some kind of statutory privilege to refuse to disclose confidential news sources, this type of legislation has not been enacted in Washington. *See* Note, *Shield Laws: The Legislative Response to Journalistic Privilege,* 26 Clev. St. L. Rev. 453, 456 (1977). Plaintiff contends that no privilege is found in the First Amendment and that creation of any privilege is a matter for the Legislature, not the courts.

The courts which have considered the issue have unanimously concluded that the First Amendment affords a reporter no *absolute* privilege of nondisclosure of confidential news sources in either a criminal or civil action. *See, e.g., Herbert v. Lando,* 441 U.S. 153, 60 L. Ed. 2d 115, 99 S.

Ct. 1635 (1979). While a number of lower courts and some legal commentators are listed as claiming "some First Amendment protection" for news reporters, there is no authoritative holding on the matter from the Supreme Court.

Even though some states have found a qualified privilege under the First Amendment and some have not, this is hardly enough to justify our venturing onto the uncertain terrain of federal constitutional interpretation if it is not necessary to do so.

■ One of those "fundamental principles" to which there should be a "frequent recurrence" by this court (Const. art. 1, § 32), is that when we can decide a case on other than constitutional grounds, we should do so. *Ohnstad v. Tacoma,* 64 Wn.2d 904, 395 P.2d 97 (1964). We can and should do so here.

■ The common law—judge–made law—insofar as it is neither inconsistent with the constitution and laws of the United States or of the State of Washington, nor incompatible with the institution and conditions of society, is the law of this state. RCW 4.04.010. *Cooper v. Runnels,* 48 Wn.2d 108, 291 P.2d 657, 57 A.L.R.2d 597 (1955). Common law is not static. It is consistent with reason and common sense (*Sayward v. Carlson,* 1 Wash. 29, 23 P. 830 (1890)). The common law "owes its glory to its ability to cope with new situations. Its principles are not mere printed fiats, but are living tools to be used in solving emergent problems." *Mills v. Orcas Power & Light Co.,* 56 Wn.2d 807, 819, 355 P.2d 781 (1960).

Where a case is not governed by statute law, as is the circumstance here, it is an appropriate occasion for this court to apply the common law to determine the outcome of the case. *See Windust v. Department of Labor & Indus.,* 52 Wn.2d 33, 323 P.2d 241 (1958). If an issue "has not been acted upon by the legislature, it is proper for us to reexamine it and determine its continued viability in light of present–day society." *Stanard v. Bolin,* 88 Wn.2d 614, 617, 565 P.2d 94 (1977).

Testimonial privilege has not been favored in the common law. Testimonial duty has been the standard. As Wigmore states:

> For more than three centuries it has now been recognized as a fundamental maxim that the public (in the words sanctioned by Lord Hardwicke) has a right to every man's evidence. When we come to examine the various claims of exemption, we start with the primary assumption that there is a general duty to give what testimony one is capable of giving and that any exemptions which may exist are distinctly exceptional, being so many derogations from a positive general rule . . .

8 J. Wigmore, *Evidence* § 2192 (1961). *Accord, State ex rel. Haugland v. Smythe,* 25 Wn.2d 161, 168, 169 P.2d 706, 165 A.L.R. 1295 (1946). Under the common law, a privilege is not created, either expressly or impliedly, simply because a conversation was made in confidence.

In *State ex rel. Haugland v. Smythe, supra,* after stating the general rule of testimonial compulsion, the court, citing Wigmore, lists the four fundamental conditions necessary to the establishment of a privilege by the court against the disclosure of communication:

> (1) The communication must originate in a confidence that it will not be disclosed; (2) the element of confidentiality must be essential to the full and satisfactory maintenance of the relation between the parties; (3) the relation must be one which in the opinion of the community ought to be sedulously fostered; and (4) the injury that would inure to the relation by the disclosure of the communication must be greater than the benefit thereby gained for the correct disposal of litigation.

*Haugland,* at 168.

Although as Wigmore points out (8 J. Wigmore, *Evidence* § 2286 (1961)), in the absence of a statute to the contrary, a confidential conversation to a journalist has not been held to be privileged (*but see, e.g., Riley v. City of Chester,* 612 F.2d 708, 715 (3d Cir. 1979); *Bruno & Stillman, Inc. v. Globe Newspaper Co.,* 633 F.2d 583 (1st Cir. 1980)), the matter has not been considered previously by this court. Contrary to the view expressed in *Senear v.*

*Daily Journal–American,* 27 Wn. App. 454, 618 P.2d 536 (1980), we have neither asserted that the power to establish a privilege rests solely with the Legislature nor denied the authority of the court to create a privilege. *State ex rel. Haugland v. Smythe, supra.* We believe it is proper for the court to reexamine the common law rule against any journalistic privilege "and determine its continued viability in light of present–day society." *Stanard,* at 617.

■ The first two conditions—confidence the communication will not be disclosed and the necessity of confidentiality to the maintenance of the relationship between the parties—are normally present so as to justify the establishment of the privilege. The third requirement, while perhaps not present in an earlier time, does exist with considerable force today. Given both the complex and diffuse nature of modern society, the need for citizens in a representative democracy to make considered judgments, and the increasing importance of journalists to convey information to citizens, the confidential relationship is one which we feel "in the opinion of the community ought to be sedulously fostered". *Haugland,* at 168.

As to the fourth condition, as noted by the Court of Appeals

> two compelling interests are at stake: the interest in allowing the press unfettered access to sources of information and the interest in allowing courts and litigants unimpaired access to testimony and relevant information in civil litigation.

*Senear,* at 461.

Particularly as considered with reference to the standards which follow regarding the exercise of a qualified privilege, we believe the injury from failing to establish the privilege would be greater than the benefit to be gained by requiring the testimony in civil litigation. *See Silkwood v. Kerr–McGee Corp.,* 563 F.2d 433, 438 (10th Cir. 1977); *Gilbert v. Allied Chem. Corp.,* 411 F. Supp. 505 (E.D. Va. 1976); *Winegard v. Oxberger,* 258 N.W.2d 847 (Iowa 1977), *cert. denied,* 436 U.S. 905, 56 L. Ed. 2d 402, 98 S. Ct. 2234

(1978). While these cases all are concerned with whether there is a First Amendment qualified privilege, their statements as to the balancing of interests and the need for a qualified privilege are germane to the questions of a common law privilege for reporters.

Although the conditions essential to the establishment of a common law qualified privilege for reporters in civil litigation have been met, the privilege can be defeated. In order to do this, however, the party contesting the privilege must show and the trial court must find that three standards have been met.

First, there must be a showing that the claim is meritorious; *i.e.,* it must not be frivolous or brought for the purpose of harassing the reporter. *Branzburg v. Hayes,* 408 U.S. 665, 710, 33 L. Ed. 2d 626, 92 S. Ct. 2646 (1972) (Powell, J., concurring); *Winegard v. Oxberger, supra.*

Second, the information sought must be necessary or critical to the cause of action or the defense pleaded. It must, as was stated by Judge (later Justice) Potter Stewart, go "to the heart of the plaintiff's claim". *Garland v. Torre,* 259 F.2d 545, 550 (2d Cir.), *cert. denied,* 358 U.S. 910, 3 L. Ed. 2d 231, 79 S. Ct. 237 (1958). *See also Carey v. Hume,* 492 F.2d 631, 636–37 (D.C. Cir.), *cert. dismissed,* 417 U.S. 938, 41 L. Ed. 2d 661, 94 S. Ct. 2654 (1974); *Zerilli v. Smith,* 7 Media L. Rptr. 1121, 1127 (D.C. Cir. 1981); *Baker v. F & F Inv.,* 470 F.2d 778, 783–84 (2d Cir. 1972), *cert. denied,* 411 U.S. 966, 36 L. Ed. 2d 686, 93 S. Ct. 2147 (1973).

Third, a reasonable effort must be made to acquire the desired information by other means. Even when the information is critical and necessary to plaintiff's case, the plaintiff must exhaust reasonably available alternative sources before a reporter is compelled to disclose.

The values resident in the protection of the confidential sources of newsmen certainly point towards compelled disclosure from the newsman himself as normally the end, and not the beginning, of the inquiry.

*Carey v. Hume, supra* at 638 (concluding after balancing

the interests that the reporter must disclose confidential sources); *see also Riley v. City of Chester, supra* at 717; *Baker v. F & F Inv., supra* at 784.

This is not to say there is no limit on a plaintiff's obligation to acquire the information by alternative means. In *Carey v. Hume, supra,* for example, where the source was alleged to be an employee of the United Mine Workers of America, the court did not require that plaintiff depose each of the union's members. *Carey v. Hume, supra* at 638–39. In *Carey,* the court went on to state:

> The courts must always be alert to the possibilities of limiting impingements upon press freedom to the minimum; and one way of doing so is to make compelled disclosure by a journalist a last resort after pursuit of other opportunities has failed. But neither must litigants be made to carry wide–ranging and onerous discovery burdens where the path is as ill–lighted as that emerging from appellant's deposition.

*Carey,* at 639. In this, as in many other contexts, the test we adopt here is one of reasonableness, keeping in mind the competing values to be served and balanced.

Finally, in addition to considering these standards, the court must also find that the interest of the reporter in nondisclosure is supported by a need to preserve confidentiality. The court, in appraising this issue, should look to how the reporter received the information and whether the source has reasonable expectation of confidentiality. *Bruno & Stillman, Inc. v. Globe Newspaper Co., supra* at 596–97. *See also* A. Bickel, *The Morality of Consent,* Yale Univ. Press, at 85 (1975). The reason for this requirement is to prevent journalists from invoking the protection of their nameless sources when no confidential relationship need be protected.

The common law is not just something "laid down in the time of Henry IV" (O. Holmes, "The Path of the Law" in R. Aldisert, *Judicial Process* 27, 37 (1976)), or a series of unchanging doctrines dating from 1889. It is a living, vital body of law which should address the problems of the day.

When long–standing rules of court and the administration of justice no longer have merit, they should be changed. *Pierce v. Yakima Vly. Mem. Hosp. Ass'n,* 43 Wn.2d 162, 260 P.2d 765 (1953). The flexibility of the common law allows the law, by the action of the court, to change. All of the conditions we have held necessary for establishing a common law privilege exist. The time has come to change and we do so. We hold there is a common law qualified privilege for journalists in civil cases. This privilege, of course, applies to both working reporters and the organizations by whom they are employed.

These three standards spelled out above and the further requirement that the interest in reportorial nondisclosure be supported by a need to preserve confidentiality will allow the trial court to establish the proper balance between need of a free press for a confidential relationship with its news sources and the obligation of citizens to testify. The order of the trial court is vacated and the matter is remanded for further proceedings consistent with this opinion.

BRACHTENBACH, C.J., and STAFFORD, WILLIAMS, and DIMMICK, JJ., concur.

UTTER, J. (concurring)—I concur with the result reached by the majority, but I disagree that the holding of this case should be based on a common law qualified privilege. It is not mere surplusage that the balancing process articulated by the majority is informed by "First Amendment values and the precedential effect which decision in any one case would be likely to have." *Bruno & Stillman, Inc. v. Globe Newspaper Co.,* 633 F.2d 583, 598 (1st Cir. 1980). In making such decisions courts must be aware that permitting unlimited discovery of journalistic notes will encroach upon First Amendment rights. *Id.*

A constitutional balance has a significant advantage in that it is not subject to legislative whim. If the Legislature were to require journalistic disclosure of all confidential

sources for publications dealing with the Legislature, the majority opinion would provide no relief. Fortunately, legislatures generally have provided greater protection than is constitutionally required. *See* Note, *Shield Laws: The Legislative Response to Journalistic Privilege,* 26 Clev. St. L. Rev. 453, 456 (1977). But that generosity is no reason to mislead the Legislature as to the constitutional limits to journalistic disclosure.

While the majority and I arrive at the same result, I see no reason to hide the constitutional nature of the privilege extended. In this case, a constitutional issue is before us, and no purpose is served by deciding the case on common law grounds to avoid recognition of the constitutional interests being balanced.

This dissenting opinion was prepared by Justice Floyd V. Hicks while a member of this court. It is adopted by the undersigned Justices.

Plaintiff/petitioner contends that no privilege for a reporter to withhold information in a judicial proceeding is to be found in the First Amendment. We agree. If some kind of shield law for reporters is necessary under present day circumstances, as the majority recognizes, it must be created. It seems to us that the Legislature, consisting of some 147 members, is better able to determine the need for creating such a shield law than is this court. This is so not only because the Legislature is closer to the people of the state than is the court, but also because the Legislature is equipped to hold hearings to determine whether such a far—reaching change in the law is truly in the public interest.

Consequently, we do not join in the court's latest creative effort.

ROSELLINI and DORE, JJ.