## NOTICE:   SLIP OPINION
## (not the court's final written decision)

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

**FILED**
**JANUARY 10, 2023**
**In the Office of the Clerk of Court**
**WA State Court of Appeals, Division III**

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| JEFFREY THURMAN, | ) | No. 38444-6-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SHERIFF OZZIE KNEZOVICH and the | ) | |
| MARITAL COMMUNITY COMPRISED | ) | |
| OF OZZIE AND JANE DOE | ) | |
| KNEZOVICH; SPOKANE COUNTY via | ) | |
| its SPOKANE COUNTY SHERIFF'S | ) | |
| OFFICE, | ) | |
| | ) | |
| Defendants, | ) | PUBLISHED OPINION |
| | ) | |
| COWLES PUBLISHING COMPANY, | ) | |
| d.b.a. The Spokesman Review, and | ) | |
| ROB CURLEY, its Executive Editor, | ) | |
| | ) | |
| Petitioners. | ) | |
| | ) | |
| KAYCIE THURMAN, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SHERIFF OZZIE KNEZOVICH and the | ) | |
| MARITAL COMMUNITY COMPRISED | ) | |
| OF OZZIE AND JANE DOE | ) | |
| KNEZOVICH; SPOKANE COUNTY via | ) | |

No. 38444-6-III
*Thurman v. Knezovich*

| | |
|---|---|
| its SPOKANE COUNTY SHERIFF'S OFFICE, | ) |
| | ) |
| | ) |
| Defendants, | ) |
| | ) |
| COWLES PUBLISHING COMPANY, | ) |
| d.b.a. The Spokesman Review, and ROB | ) |
| CURLEY, its Executive Editor, | ) |
| | ) |
| Petitioners. | ) |

LAWRENCE-BERREY, A.C.J. — Washington's "Reporter Shield Law,"

RCW 5.68.010, provides the news media broad protection against compelled disclosure

of confidential sources of news and information and qualified protection against

compelled disclosure of news and information. A subpoena and subpoena duces tecum

directed to the executive editor of a newspaper required the trial court to discern the

breadth of the qualified protection. We granted discretionary review of the trial court's

protective order. We hold that the reporter's qualified privilege, RCW 5.68.010(1)(b),

protects against compelled disclosure of documents or information related to an

agreement between a sheriff and the executive editor to delay investigating and reporting

a story, but it does not protect the dates and times when discussions or activities occurred.

We partly reverse the trial court's protective order.

2

No. 38444-6-III
*Thurman v. Knezovich*

FACTS[1]

On June 13, 2019, Spokane County Sheriff Ozzie Knezovich gave a press conference announcing the termination of Sergeant Jeffrey Thurman. Sheriff Knezovich stated that an internal investigation started on May 8, 2019, after a Black deputy reported overhearing Sergeant Thurman making a highly offensive racial statement. The sheriff stated the internal investigation confirmed the report and uncovered other misconduct.

Soon after the press conference, the sheriff's office sent a Spokesman-Review reporter a press release about Mr. Thurman's termination. That afternoon, the Spokesman-Review published the story. On June 14, the news story was distributed nationwide by the Associated Press. On September 3, 2019, Mr. Thurman filed a complaint asserting a number of claims against Sheriff Knezovich and the Spokane County Sheriff's Office, including defamation.

---

[1] Mr. Thurman supplemented the record with over 1,000 pages of clerk's papers. Almost all of these pleadings postdate the June 25, 2021 hearing of the order being reviewed. The pleading that predates the hearing is a 124-page amended complaint, which cites to but does not append portions of depositions and discovery answers. The trial court did not consider that filing when it ruled on the protective order. We confine our review of the record to that considered by the trial court when it entered its protective order. *See State v. Curtiss*, 161 Wn. App. 673, 703, 250 P.3d 496 (2011).

No. 38444-6-III
*Thurman v. Knezovich*

### *May 2019 agreement to delay publishing*

During the course of discovery, Mr. Thurman learned of an agreement between the sheriff and Robert Curley, the executive editor of the Spokesman-Review. When deposed, the sheriff explained:

> I spoke with Mr. Curley because I had a good enough relationship with Mr. Curley that I trusted that he would not run that story or go with that story.
> . . . .
> . . . I tried to keep this out of the media as long as possible so there would be a clean investigation. No one would be able to say one way or another that I made a decision based on media pressure.

Clerk's Papers (CP) at 171. He testified he did not request the Spokesman-Review to stop investigating, just to delay publishing the story until the investigation concluded.

But one deputy testified differently: he recalled the sheriff telling him that the newspaper's editor was upset because one of its reporters had contacted the sheriff's department's press officer while the internal investigation was pending. The deputy inferred that Mr. Curley was upset because the reporter had disregarded the agreement between him and the sheriff to stop investigating.

The sheriff was unable to recall the exact date he spoke with Mr. Curley, but estimated it was within the first two weeks of the internal investigation. He recalled the conversation being in person, but he had no records of when it occurred. In a later deposition, the sheriff recalled speaking to Mr. Curley two to three weeks after the

No. 38444-6-III
*Thurman v. Knezovich*

investigation started, but again, he was not certain of the exact date. He believed he

spoke with Mr. Curley on May 30, 2019, or the week prior.

### *Information subpoenaed by Mr. Thurman*

On May 21, 2021, Mr. Thurman served a deposition subpoena and subpoena duces

tecum (SDT) on "Robert Curley *Spokesman Review*." CP at 40 (capitalization omitted).

We limit our discussion to those paragraphs of the SDT related to our grant of

discretionary review.

In paragraphs 1a, 1b, and 1c of the SDT, Mr. Thurman sought records of

communications with the sheriff about any agreement to delay investigating or publishing

Mr. Thurman's story. In paragraphs 1g and 1h of the SDT, Mr. Thurman sought the

identities of the reporters who attended the June 13, 2019 press conference and when they

were dispatched to the press conference. In paragraph 2 of the SDT, Mr. Thurman sought

records of communications about delaying publication of discussions between the sheriff

and the local NAACP[2] about disproportionate arrest rates.

---

[2] National Association for the Advancement of Colored People.

No. 38444-6-III
*Thurman v. Knezovich*

*Motion for protective order*

The Spokesman-Review moved for a protective order. It argued the SDT sought records protected by RCW 5.68.010(1)(b), the reporter's qualified privilege, and that Mr. Thurman had not overcome the qualified privilege by clear and convincing evidence as required by RCW 5.68.010(2).

Mr. Thurman opposed the motion. He argued RCW 5.68.010(1)(b) does not apply to an agreement between a publishing company's executive editor and a public official to prevent its investigative journalists from gathering news. He argued, even if the agreement was subject to a qualified privilege, he had established facts to overcome the privilege because

> the information sought is highly material and relevant because it goes directly to the cause or causes behind the Sheriff's truncated investigatory process, and his intent to defame Sgt. Thurman as part of the deal he made with a publisher. The timing in particular is information critical and necessary to the maintenance of Plaintiff Thurman's claims against the Sheriff. This timing, and the deal itself, are probative of an issue material to this claim; that is, that the Sheriff commenced his entire intended media process on May 8, 2019 at the very outset of his purported investigation, by making a deal with [the Spokesman-Review] to prevent any true journalist investigation into the explosive story that the Sheriff was intending to deliver to [the Spokesman-Review] as an exclusive.

CP at 89-90.

6

No. 38444-6-III
*Thurman v. Knezovich*

The trial court reviewed written submissions, heard arguments, and later entered written findings and conclusions supporting its protective order. The order narrowed some aspects of the SDT and permitted the deposition of Mr. Curley to be taken, consistent with the breadth of the narrowed SDT.

*Petition for discretionary review*

The Spokesman-Review petitioned this court for discretionary review of the trial court's protective order. It argued the trial court erred in construing the Reporter Shield Law. Our commissioner requested the trial court to clarify its ruling with respect to what aspects of the SDT it found were privileged.

The trial court made supplemental findings. It found that the qualified privilege did not protect materials in the possession of Mr. Curley reflecting a request by the sheriff not to investigate, not to publish, and/or not to follow up on information about the internal investigation of Mr. Thurman. The court also found that the privilege did not protect the Spokesman-Review from identifying the reporters assigned to the sheriff's press conference or the time they were dispatched to the conference.

7

No. 38444-6-III
*Thurman v. Knezovich*

The trial court further found that the qualified privilege protected the information sought in paragraph 2 of the SDT, but that Mr. Thurman had overcome the privilege. With respect to overcoming the privilege, the court found

> there is clear and convincing evidence in this case that there is a prima facie cause of action as it relates to a claim/some claims between Plaintiffs and Defendants, that the information sought . . . is highly material and relevant, that the information is necessary as to at least one element of proof of an issue material to the claim(s), that the Plaintiffs have exhausted all reasonable means to obtain the information from alternative sources, and there is a compelling public interest in the disclosure of the loss of a free press.

CP at 345.

We granted discretionary review to construe the breadth of the qualified privilege and stayed the court's order under RAP 8.1(b)(3).[3]

---

[3] After oral argument, we directed Mr. Thurman to provide citations to the record to support several assertions of fact we questioned. Not long after he responded to our request, he moved to dismiss the appeal as moot under RAP 18.9(c). He indicated he intended to withdraw the subpoenas at issue because the trial date was fast approaching. The Spokesman-Review opposed the motion.

RAP 18.9(c)(2) provides that "[t]he appellate court will, on motion of a party, dismiss review of a case . . . if the application for review . . . is moot . . . ." A motion to dismiss as moot under RAP 18.9(c)(2) can be raised at any time. *See State v. Ross*, 152 Wn.2d 220, 228 n.1, 95 P.3d 1225 (2004). The appellate court, however, has discretion to decide the issue in order to provide guidance to lower courts "if a case presents an issue of continuing and substantial public interest and that issue will likely reoccur . . . ." *Id.* at 228. Because this case involves a statutory provision that has not been interpreted by an appellate court and because an authoritative interpretation will help guide lower courts, we deny Mr. Thurman's motion to dismiss.

No. 38444-6-III
*Thurman v. Knezovich*


ANALYSIS

In the first part of our analysis, we construe the scope of the reporter's qualified

privilege. We then identify what records, subpoenaed by Mr. Thurman, are protected by

that privilege. In the second part of our analysis, we construe some of the factors that

must be proved by clear and convincing evidence to overcome the qualified privilege.[4]

A.     THE QUALIFIED PRIVILEGE

In *Senear v. Daily Journal-American*, 97 Wn.2d 148, 641 P.2d 1180 (1982), our

Supreme Court recognized that journalists had a common law privilege with respect to

their sources of information. In 2007, our legislature codified this privilege in

RCW 5.68.010 by enacting its own Reporter Shield Law, under which:

> (1)  Except as provided in subsection (2) of this section, no judicial,
> legislative, administrative, or other body with the power to issue a subpoena
> or other compulsory process may compel the news media to testify,
> produce, or otherwise disclose:
>      (a)  The identity of a source of any news or information or any
> information that would tend to identify the source where such source has a
> reasonable expectation of confidentiality; or
>      (b)  Any news or information obtained or prepared by the news
> media in its capacity in gathering, receiving, or processing news or
> information for potential communication to the public, including, but not

---

[4] Mr. Thurman recently filed a notice with this court, advising us that he received a substantial jury verdict against the sheriff. We infer the jury found that Mr. Thurman did not commit any misconduct. The jury verdict has no relevance to our decision. But we mention it, out of fairness, to remedy whatever harm Mr. Thurman might suffer from this published opinion.

9

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 38444-6-III
*Thurman v. Knezovich*

limited to, any notes, outtakes, photographs, video or sound tapes, film, or other data of whatever sort in any medium now known or hereafter devised. This does not include physical evidence of a crime.

RCW 5.68.010(2) provides that in civil matters, the privilege in subsection (1)(b) may be overcome under certain circumstances. Thus, "the news media has an absolute privilege with respect to the information contained in subsection (1)(a) and it has a qualified privilege with respect to the information contained in subsection (1)(b)." *Republic of Kazakhstan v. Does 1-100*, 192 Wn. App. 773, 783, 368 P.3d 524 (2016).

Although this statute was enacted over 15 years ago, there is no Washington appellate decision construing the breadth of the qualified privilege at issue here. We thus begin by setting forth the applicable rules of statutory construction.

The meaning of a statute is a question of law that we review de novo. *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9, 43 P.3d 4 (2002). In construing a statute, our "fundamental objective is to ascertain and carry out the Legislature's intent, and if the statute's meaning is plain on its face, then the court must give effect to that plain meaning as an expression of legislative intent." *Id.* at 9-10. The plain meaning is "discerned from all that the Legislature has said in the statute and related statutes which disclose legislative intent about the provision in question." *Id.* at 11. "When a term has a

10

No. 38444-6-III
*Thurman v. Knezovich*

well-accepted, ordinary meaning, we may consult a dictionary to ascertain the term's

meaning." *State v. Alvarado*, 164 Wn.2d 556, 562, 192 P.3d 345 (2008).

Additionally, because "'privileges impede the search for truth[,]'" they must be

narrowly construed. *Lowy v. PeaceHealth*, 174 Wn.2d 769, 778, 280 P.3d 1078 (2012)

(quoting *Versuslaw, Inc. v. Stoel Rives, LLP*, 127 Wn. App. 309, 332, 111 P.3d 866

(2005)). Similarly, with respect to the qualified privilege of RCW 5.68.010(1)(b),

because that privilege is wholly statutory and unknown at common law, it "must be

strictly construed by interpreting the specific words in the statute that the legislature has

codified." *Magney v. Truc Pham*, 195 Wn.2d 795, 803, 466 P.3d 1077 (2020). We now

apply these rules to the facts before us.

1.      *The agreement to delay publishing*

The Spokesman-Review contends that any information about the agreement

between Mr. Curley and the sheriff to delay publishing the story about Mr. Thurman is

protected by the qualified reporter's privilege. It argues the information was obtained in

its "capacity in gathering, receiving, or processing news or information for potential

communication to the public . . . ." RCW 5.68.010(1)(b). We partly agree.

The ordinary meaning of "capacity" includes "[t]he role in which one performs an

act; esp[ecially], someone's job, position, or duty." BLACK'S LAW DICTIONARY 257 (11th

11

No. 38444-6-III
*Thurman v. Knezovich*

ed. 2019). The news media is acting in a privileged capacity when it is "gathering, receiving, or processing news or information for potential communication to the public." The question before us is whether "processing" news or information encompasses a promise to *delay* publishing potential communication to the public.

The meaning of "process[ing]" includes "prepar[ing] for market, manufacture, or other commercial use by subjecting to some process . . . ." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1808 (1993). In turn, the ordinary meaning of "process" includes "a progressive forward movement from one point to another on the way to completion . . . ." *Id*. "Processing" thus encompasses how news or information progresses forward to completion. Thus, a delay in publishing news is a manner of "processing" news or information.[5]

Here, the sheriff spoke to Mr. Curley to obtain a promise that the newspaper would not publish an article about Mr. Thurman until the department's internal investigation was completed. Arguably, this promise included a collateral promise for the newspaper to not contact persons in the sheriff's office until the internal investigation was completed.

_____

[5] The qualified privilege encompasses news or information for "*potential* communication to the public." This case does not present the question of whether an agreement to *not* publish news is protected by the qualified reporter's privilege. The answer to that question is left for another day.

12

No. 38444-6-III
*Thurman v. Knezovich*

Either way, the agreement between the sheriff and Mr. Curley was made in the news media's protected capacity because it concerned how news or information would be processed for potential communication to the public. Any records of communication in this regard are thus subject to the qualified privilege of RCW 5.68.010(1)(b). The same analysis and conclusion follow with respect to the purported agreement between the sheriff and Mr. Curley to delay publishing a story about discussions between the sheriff's office and the NAACP about disproportionate arrest rates.

2.      *Date of agreement*

The parties dispute whether the date of the agreement between Mr. Curley and the sheriff is privileged. For three reasons, we conclude it is not. First, the plain language of the qualified privilege applies only to "[a]ny news or information obtained or prepared . . . for potential communication to the public." A date of a discussion is not "[a]ny news or information obtained or prepared." Second, even if the phrase can be construed more broadly, the rules of construction noted above require us to construe it narrowly.[6] Third, parties use privilege logs to disclose the nature of the claimed privilege in a manner that will enable the opposing party to assess the claim, without revealing privileged

---

[6] The absolute privilege set forth in RCW 5.68.010(1)(a) arguably is based on common law and, if so, that privilege would not be susceptible to a narrow construction.

13

No. 38444-6-III
*Thurman v. Knezovich*

information. *See, e.g.*, FED. R. CIV. P. 26(b)(5)(A)(ii). In doing so, they often disclose

the dates of a discussion without disclosing its substance. *See, e.g.*, *Sanders v. State*,

169 Wn.2d 827, 837, 240 P.3d 120 (2010); *Rental Hous. Ass'n of Puget Sound v. City of*

*Des Moines*, 165 Wn.2d 525, 538, 199 P.3d 393 (2009). The use of dates in privilege

logs supports our view that dates, generally, are not privileged.

   3.      *Identity of reporters and time of dispatch*

   Mr. Thurman also requested the identity of reporters who covered the

June 13, 2019 press conference and the time of their dispatch. To the extent records

identifying the reporters were made, they were made in preparation for publishing a news

story and were therefore made in the newspaper's protected capacity in "gathering,

receiving, or processing news or information for potential communication to the public."

RCW 5.68.010(1)(b). These records are thus protected by the qualified privilege.

However, for the same reason we determined that the date of a privileged communication

is not protected, we conclude that the time of the reporters' dispatch to the news

conference is not protected.[7]

---

   [7] In paragraphs 3, 4, and 5 of the SDT, Mr. Thurman requested records of communications between the executive editor and the sheriff and the sheriff's attorneys *after* various discovery requests were made. The Spokesman-Review has not argued how these records are protected by the Reporter's Shield Law. We view these portions of the SDT as outside the scope of our discretionary review.

14

No. 38444-6-III
*Thurman v. Knezovich*

       B.       OVERCOMING THE QUALIFIED PRIVILEGE

The Spokesman-Review contends the trial court erred by finding that Mr. Thurman

overcame the qualified privilege.  We agree.

RCW 5.68.010(2) provides in relevant part:

> A court may compel disclosure of the news or information [protected by the qualified privilege] if the court finds that the party seeking such news or information established by clear and convincing evidence:
>     . . . .
>     [(a)](ii)  In a civil action or proceeding . . . there is a prima facie cause of action; and
>     (b)  In all matters, whether criminal or civil, that:
>     (i)  The news or information is highly material and relevant;
>     (ii)  The news or information is critical or necessary to the maintenance of a party's claim, defense, or proof of an issue material thereto;
>     (iii)  The party seeking such news or information has exhausted all reasonable and available means to obtain it from alternative sources; and
>     (iv)  There is a compelling public interest in the disclosure.  A court may consider whether or not the news or information was obtained from a confidential source in evaluating the public interest in disclosure.

In its supplemental findings, entered at the request of our commissioner, the trial

court found that Mr. Thurman established factors (i) through (iv) by clear and convincing

evidence.  For the reasons below, we disagree that the record contains sufficient evidence

15

No. 38444-6-III
*Thurman v. Knezovich*

to support these findings with respect to the first and second factors.[8]

### 1.    *Highly material and relevant*

Mr. Thurman does not convincingly argue how the privileged information he seeks is highly material and relevant to his defamation claim.  He argues the sheriff wanted to prevent the Spokesman-Review from doing an independent investigation until he could fashion the narrative with the internal investigation's biased and erroneous findings.  But whether the sheriff asked the newspaper to delay investigating and publishing is not "highly material and relevant" for showing bias and error in the internal investigation. Rather, bias and error are shown by finding exculpatory evidence that should have been uncovered through a proper internal investigation.

Mr. Thurman also argues he is "entitled to know if [the Spokesman-Review] was facilitating the Sheriff's entirely false narrative" and thus "the movements of [its] reporters and any deals with the local NAACP or its president were also relevant."  Br. of

---

[8] Neither party briefed what deference we must give to the trial court's RCW 5.68.010(2)(b) findings.  We note that the trial court reviewed the same written record we have reviewed, although we likely had much greater time to do so.  We further note that the trial court was not called on to weigh competing documentary evidence or to determine issues of credibility when it found that the privileged information is "highly material and relevant" or "critical or necessary" to Mr. Thurman's defamation claim. For these reasons, we apply the de novo standard of review discussed in cases such as *Dolan v. King County*, 172 Wn.2d 299, 310, 258 P.3d 20 (2011).

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 38444-6-III
*Thurman v. Knezovich*

Resp'ts at 51. He does not explain how these movements and deals show the newspaper facilitated a false narrative.

We conclude that Mr. Thurman has failed to establish by clear and convincing evidence that the privileged information he seeks is highly material and relevant to his defamation claim.

### 2. *Critical or necessary*

Mr. Thurman does not convincingly argue that the information he seeks is critical or necessary to his defamation claim.

Decisions from foreign courts construing similar statutory protections to our own are helpful. *See State v. Funkhouser*, 30 Wn. App. 617, 636 n.10, 637 P.2d 974 (1981). Certain portions of New York's reporter shield law is similar to ours.

In New York, professional journalists and newscasters are not subject to contempt for failing to disclose nonconfidential news "unless the party seeking such news has made a clear and specific showing that the news: (i) is highly material and relevant; (ii) is critical or necessary to the maintenance of a party's claim, defense or proof of an issue material thereto; and (iii) is not obtainable from any alternative source." N.Y. CIV. RIGHTS LAW § 79-h(c) (McKinney 1992).

17

No. 38444-6-III
*Thurman v. Knezovich*

Courts construing the second factor—critical or necessary—require a party to show "that the claim for which the information is to be used 'virtually rises or falls with the admission or exclusion of the proffered evidence.'" *In re Application to Quash Subpoena to Nat'l Broad. Co.*, 79 F.3d 346, 351 (2d Cir. 1996) (quoting *United States v. Marcos*, No. 87 CR 598, 1990 WL 74521, at *3 (S.D.N.Y. June 1, 1990)). "'The test is not merely that the material be helpful or probative, but whether or not . . . the action may be presented without it.'" *Baker v. Goldman Sachs & Co.*, 669 F.3d 105, 108 (2d Cir. 2012) (alteration in original) (quoting *In re Subpoena Duces Tecum to Am. Broad. Cos.*, 189 Misc. 2d 805, 808, 735 N.Y.S.2d 919 (N.Y. Sup. Ct. 2001)). We adopt this heightened standard here.

Mr. Thurman fails to show that the protected information is "critical or necessary." His defamation claim against the sheriff and the sheriff's office certainly will not rise or fall based on any agreement between Mr. Curley and the sheriff to delay investigating or publishing a story.

CONCLUSION

RCW 5.68.010(1)(b) provides a qualified privilege protecting much of the information sought in the SDT. But it does not protect the disclosure of dates and times. Because Mr. Thurman fails to overcome the qualified privilege by clear and convincing

18

No. 38444-6-III
*Thurman v. Knezovich*

evidence, we partly reverse the trial court's protective order.

Lawrence-Berrey, A.C.J.

WE CONCUR:

Pennell, J.

Staab, J.

19