[No. 44544. En Banc. June 2, 1977.]

L. L. STANARD, *Appellant,* v. RAYMOND J. BOLIN, *Respondent.*

*Jack H. H. Dibblee,* for appellant.

*Delay, Curran & Boling, J. Donald Curran, Va Lena Scarpelli Curran,* and *Martin L. Salina,* for respondent.

HAMILTON, J.—This appeal presents the question of whether the common–law action for breach of promise to marry should be abolished. The trial court concluded that the action was contrary to public policy and dismissed the plaintiff's (appellant's) complaint with prejudice under CR 12(b)(6) for failure to state a claim upon which relief can be granted. We accepted review and conclude that the action is not contrary to public policy.

Because plaintiff's complaint was dismissed under CR 12(b)(6), the factual contentions of her complaint must be accepted as true for purposes of review. *Barnum v. State,* 72 Wn.2d 928, 435 P.2d 678 (1967). Plaintiff's complaint stated two claims for relief. Both claims alleged the

same facts but prayed for different damages. We will first set forth the facts and conclude with plaintiff's prayers for relief.

In October 1974, plaintiff and defendant (respondent) were introduced to each other by mutual friends, and their courtship developed soon thereafter. During the course of their courtship, defendant assured plaintiff that he was worth in excess of $2 million, was planning to retire in 2 years, and that the two of them would then travel. Defendant also promised plaintiff that she would never have to work again and that he would see to the support of her two teen–age boys. He also promised to see that the plaintiff's mother would never be in need.

On September 22, 1975, plaintiff accepted defendant's proposal of marriage. Thereafter, defendant took her to a jewelry store and purchased an engagement ring and matching wedding rings. The parties found a suitable home for their residence and signed the purchase agreement as husband and wife. At the insistence of defendant, plaintiff placed her home on the market for sale and sold most of her furniture at a public auction. The parties set December 13, 1975, as their wedding date, reserved a church, and engaged a minister to perform the service. Dresses for plaintiff, her mother, and the matron of honor were ordered, and a reception was arranged at a local establishment. The parties began informally announcing their plans to a wide circle of friends. After the wedding date was set, plaintiff's employer hired another person and requested plaintiff to assist in teaching the new employee the duties of her job.

On November 13, 1975, defendant informed plaintiff that he would not marry her. This came as a great shock to plaintiff and caused her to become ill and lose sleep and weight. Plaintiff sought medical advice and was treated by her physician. Plaintiff also had to take her home off the market and repurchase furniture at a cost in excess of that which she received for her older furniture. In addition,

plaintiff was forced to cancel all wedding plans and reservations, and to explain to her matron of honor, her mother, and her children, that she was not marrying. Plaintiff was also obliged to return wedding gifts and to face her friends and neighbors, each of whom felt entitled to an explanation.

In her first claim for relief, plaintiff sought damages to compensate her for her pain, impairment to health, humiliation, and embarrassment. Plaintiff's second claim sought damages to compensate her for her loss of expected financial security.

■ The breach–of–marriage–promise action has its origins in the common law. Professor Clark, a well–known authority on family law, has posited that 17th century English conceptions of marriage as largely a property transaction caused the English common–law courts to intervene in a subject matter which, up until the 17th century, had been almost exclusively under the jurisdiction of the ecclesiastical courts. *See* H. Clark, *The Law of Domestic Relations in the United States* 2 (1968) (hereafter cited as Clark). In any event, the action was carried forward into the common law of Washington (*see* RCW 4.04.010) and was recognized by this court as early as 1905. *See Heasley v. Nichols,* 38 Wash. 485, 80 P. 769 (1905). Because the action has its origins in the common law and has not been acted upon by the legislature, it is proper for us to reexamine it and determine its continued viability in light of present–day society. *See Freehe v. Freehe,* 81 Wn.2d 183, 500 P.2d 771 (1972); *Pierce v. Yakima Valley Memorial Hosp. Ass'n,* 43 Wn.2d 162, 260 P.2d 765 (1953); *Wyman v. Wallace,* 15 Wn. App. 395, 549 P.2d 71 (1976).

The breach–of–promise–to–marry action is one not easy to classify. Although the action is treated as arising from the breach of a contract (the contract being the mutual promises to marry), the damages allowable more closely resemble a tort action. Thus, the plaintiff may recover for loss to reputation, mental anguish, and injury to health, in

addition to recovering for expenditures made in preparation for the marriage and loss of the pecuniary and social advantages which the promised marriage offered. In addition, some states allow aggravated damages for seduction under promise to marry and for attacks by the defendant on the plaintiff's character. Furthermore, some states allow punitive damages when the defendant's acts were malicious or fraudulent. For a comprehensive discussion of the damages allowable under a breach–of–promise–to–marry action and a collection of cases, *see* Annot., *Measure and elements of damages for breach of contract to marry,* 73 A.L.R.2d 553 (1960), and C. McCormick, *Handbook on the Law of Damages* 397–406 (1935).

■ The action in its present form is subject to almost uniform criticism by the commentators, although our research has not disclosed any cases in which a court has abolished the action.[1] In essence, these criticisms are: (1) the action is used as an instrument of oppression and blackmail; (2) engaged persons should be allowed to correct their mistakes without fear of publicity and legal compulsion; (3) the action is subject to great abuse at the hands of gullible and sympathetic juries; (4) it is wrong to allow under the guise of contract an action that is essentially tortious and penal in nature; and, (5) the measure of damages is unjust because damages are allowed for loss of social and economic position, whereas most persons marry for reasons of mutual love and affection. *See; e.g.,* 1 C. Vernier, *American Family Laws* 26–27 (1931); Brown, *Breach of Promise Suits,* 77 U. Pa. L. Rev. 474 (1929); Wright, *The Action for*

---

[1]The action has been abolished or modified by statute in some states. *See* Ala. Code tit. 7, § 114; Cal. Civ. Code Ann. § 43.5 (West); Colo. Rev. Stat. § 13–20–202; Conn. Gen. Stat. Ann. § 52–572b (West Supp. 1977); Fla. Stat. Ann. § 771–.01 (West); Ind. Code Ann. § 34–4–4–1 (Burns Supp. 1976); Me. Rev. Stat. Ann. tit. 14, § 854 (West); Md. Cts. & Jud. Proc. Code Ann. § 5–301 (1974); Mass. Gen. Laws Ann. ch. 207, § 47A (West); Mich. Stat. Ann. § 25.191; Nev. Rev. Stat. § 41.380; N.H. Rev. Stat. Ann. § 508:11; N.J. Stat. Ann. § 2A:23–1 (West); N.Y. Civ. Rights Law § 80–a *et seq.* (McKinney); Pa. Stat. Ann. tit. 48, § 171 (Purdon); W. Va. Code § 56–3–2a (Supp. 1976); Wis. Stat. Ann. § 248.01 (West Supp. 1976); Wyo. Stat. § 1–728.

*Breach of the Marriage Promise,* 10 Va. L. Rev. 361 (1924); White, *Breach of Promise of Marriage,* 10 L. Quar. Rev. 135 (1894). Although some of these criticisms are not without merit, we do not believe they justify an outright abolishment of the action.

When two persons agree to marry, they should realize that certain actions will be taken during the engagement period in reliance on the mutual promises to marry. Rings will be purchased, wedding dresses and other formal attire will be ordered or reserved, and honeymoon plans with their attendant expenses will be made. Wedding plans, such as the rental of a church, the engagement of a minister, the printing of wedding invitations, and so on, will commence. It is also likely that the parties will make plans for their future residence, such as purchasing a house, buying furniture, and the like. Further, at the time the parties decide to marry, they should realize that their plans and visions of future happiness will be communicated to friends and relatives and that wedding gifts soon will be arriving. When the plans to marry are abruptly ended, it is certainly foreseeable that the party who was unaware that the future marriage would not take place will have expended some sums of money and will suffer some forms of mental anguish, loss to reputation, and injury to health. We do not feel these injuries should go unanswered merely because the breach–of–promise–to–marry action may be subject to abuses; rather, an attempt should be made to eradicate the abuses from the action.

One major abuse of the action is allowing the plaintiff to bring in evidence of the defendant's wealth and social position. This evidence is admissible under the theory that the plaintiff should be compensated for what she or he has lost by not marrying the defendant. *See, e.g., Bundy v. Dickinson,* 108 Wash. 52, 182 P. 947 (1919); *Larson v. McMillan,* 99 Wash. 626, 170 P. 324 (1918); *Fisher v. Kenyon,* 56 Wash. 8, 104 P. 1127 (1909); and *Heasley v. Nichols, supra.*

Although damages for loss of expected financial and social position more closely resemble the contract theory of recovery than the other elements of damages for breach of promise to marry, we do not believe those damages are justified in light of modern society's concept of marriage. Although it may have been that marriages were contracted for material reasons in 17th century England, marriages today generally are not considered property transactions, but are, in the words of Professor Clark, "the result of that complex experience called being in love." Clark, *supra* at 2. A person generally does not choose a marriage partner on the basis of financial and social gain; hence, the plaintiff should not be compensated for losing an expectation which he or she did not have in the first place. Further, the breach–of–promise–to–marry action is based on injuries to the plaintiff, and evidence of the defendant's wealth tends to misdirect the jury's attention when assessing the plaintiff's damages towards an examination of the defendant's wealth rather than the plaintiff's injuries.

Professor McCormick has concluded that evidence of the defendant's wealth has a more potent effect upon the size of the verdict than any instruction on damages. *See* C. McCormick, *Handbook on the Law of Damages* 399 n.36 (1935). If this is so, then it presents a very strong reason for disallowing any evidence of the defendant's wealth and social position. We conclude that damages for loss of expected financial and social position should no longer be recoverable under the breach–of–promise–to–marry action. This means that evidence of the defendant's wealth and social position becomes immaterial in assessing the plaintiff's damages.

■ Other damages subject to criticism are those damages given for mental anguish, loss to reputation, and injury to health. It is argued that these injuries are "so vague and so little capable of measurement in dollars that they give free rein to the jury's passions, prejudices and sympathies." *See* Clark, *supra* at 12. This argument has little merit, for it places no faith in the jury's ability to evaluate objectively

the evidence regarding plaintiff's injuries and render a just verdict. If a jury's verdict is tainted by passion or prejudice, or is otherwise excessive, the trial court and the appellate court have the power to reduce the award or order a new trial. *See Hogenson v. Service Armament Co.*, 77 Wn.2d 209, 461 P.2d 311 (1969); *Kramer v. Portland–Seattle Auto Freight, Inc.*, 43 Wn.2d 386, 261 P.2d 692 (1953); *Steinman v. Seattle*, 16 Wn. App. 853, 560 P.2d 357 (1977); *Freeman v. Intalco Aluminum Corp.*, 15 Wn. App. 677, 552 P.2d 214 (1976). Lack of ability to quantify damages in exact dollar amounts does not justify abolishing the breach–of–promise–to–marry action. In her complaint plaintiff alleged that she had suffered pain, impairment to health, humiliation, and embarrassment as a result of the defendant's breach of his promise to marry. If this is true, and we must assume it is for purposes of review, then she is entitled to compensation for these injuries.

As for retaining aggravated damages for seduction under a promise to marry, and the like, since plaintiff here was not seeking aggravated damages, we leave a decision on aggravated damages for a future case in which the issue for these damages arises. Also, we note that although other states allow punitive damages, these damages are not allowed in this state because they are not authorized by statute. *See Steele v. Johnson*, 76 Wn.2d 750, 458 P.2d 889 (1969).

We also do not believe the action should be abolished so that engaged persons are free from compulsion to choose whether to end an engagement. Although the policy of the state should not be to encourage a person to marry when he or she has begun to have second thoughts about a prospective mate, it is also the policy of this state to afford an avenue of redress for injuries suffered due to the actions of another. Allowing recovery for injuries, which are foreseeable at the time of entering into the relationship, should not be denied on the presumption the defendant would rather enter into the marriage than pay damages for the injuries caused. Furthermore, it is hard to conceive of a

plaintiff suing a defendant in order to coerce the defendant into a marriage which would be unstable at best. It is possible that there may be such a plaintiff, but that is no reason for abolishing the action for all plaintiffs, for that would cause most plaintiffs to go uncompensated for their injuries at the expense of a few unworthy plaintiffs.

In conclusion, we have decided that the breach–of–promise–to–marry action should be retained as a quasi-contract, quasi–tort action for the recovery of the foreseeable special and general damages which are caused by a defendant's breach of promise to marry. However, the action is modified to the extent that a plaintiff cannot recover for loss of expected financial and social position, because marriage is no longer considered to be a property transaction.

The judgment of the trial court is reversed on plaintiff's first claim for relief, and remanded for further proceedings consistent with this opinion. The judgment is affirmed on plaintiff's second claim for relief, which sought damages for loss of prospective economical and social advantage.

WRIGHT, C.J., and ROSELLINI, STAFFORD, BRACHTENBACH, HOROWITZ, and HICKS, JJ., concur.

UTTER, J. (dissenting)—The majority, in a well–written opinion, has set forth the historical background of the action for breach of promise to marry. It states the policy reasons for abolishing the action, but chooses to retain its major underpinnings. The sole change is to modify the doctrine to the extent that a plaintiff can no longer recover for loss of expected financial and social position, but may still recover foreseeable special and general damages caused by breach of a defendant's promise to marry.

I believe the change advocated does not go far enough. Motive of the defendant may still, apparently, be considered in assessing damages. *Warner v. Benham,* 126 Wash. 393, 218 P. 260, 34 A.L.R. 1358 (1923). Where the breach of promise to marry is wanton or deliberate, the effect is to

allow exemplary damages, contrary to the public policy of our state. *Wyman v. Wallace,* 15 Wn. App. 395, 549 P.2d 71 (1976). In *Wyman,* at page 398, the Court of Appeals abolished the action for alienation of affections of a spouse by an unrelated third person on the ground, among others, that "the element of punishment is so inextricably interwoven into any award of damages for alienation of the affections of a spouse that the true nature of the award is punitive." This is no less true in this case than it was in *Wyman.* In addition, in 1973 our state adopted a new dissolution of marriage act. RCW 26.09. The establishment of the fact that a marriage is "irretrievably broken" is now a sufficient ground for dissolution, with no finding of fault necessary. The trial judge observed in his memorandum decision on motion to dismiss:

> The current public policy expressed in the 1973 Dissolution Act is to disregard fault in the judicial determination of property rights at the dissolution of a marriage. Fault is not to be considered in determining which party shall have the decree. There are no damages as such in a dissolution. Is it not obvious, however, that one of the parties to a dissolution suffers at least as much humiliation, embarrassment, mental suffering and loss of financial expectation and security as does a party to the breakup of an engagement?
>
> It is significant that there was no divorce by judicial decree at common law when the breach of promise action came into being. *Tupper v. Tupper,* 63 Wn.2d 585. Should not the public policy declared in the divorce statutes be applicable to engagements? I believe it is.

The majority lists the almost uniform criticisms of the action by commentators: "(1) the action is used as an instrument of oppression and blackmail; (2) engaged persons should be allowed to correct their mistakes without fear of publicity and legal compulsion; (3) the action is subject to great abuse at the hands of gullible and sympathetic juries; (4) it is wrong to allow under the guise of contract an action that is essentially tortious and penal in nature . . ."

I believe these criticisms are sufficient grounds, given the recently enunciated policy of the state in the dissolution of marriage act, to justify our abolition of this now obsolete, judicially created, cause of action.

DOLLIVER, J., concurs with UTTER, J.