Sharon WILDEY, Plaintiff,

v.

Richard A. SPRINGS, III, Defendant.

No. 92 C 8146.

United States District Court,
N.D. Illinois, E.D.

Jan. 19, 1994.

Terence E. Flynn, Gessler, Flynn, Fleischmann, Hughes & Socol, and Joseph V. Bomba, Chicago, IL, for plaintiff.

Bernard J. Nussbaum, Jonathan B. Piper, and Sanford M. Pastroff, Sonnenschein, Nath & Rosenthal, Chicago, IL, for defendant.

## MEMORANDUM OPINION AND ORDER

CONLON, District Judge.

In a case that has become notorious in legal circles and in the press, Sharon Wildey sued her former fiance, Richard A. Springs, III, for breaking their engagement. Wildey sued Springs for breaching a promise to marry under Illinois' Breach of Promise Act, 740 ILCS 15/1, *et seq.* ("the promise act"). Wildey claimed that by severing the engagement, Springs has caused her, and continues to cause her, emotional trauma, professional and financial difficulties, and pain and suffering. The jury agreed. The jury found in favor of Wildey and awarded her $178,000. Springs now challenges the jury verdict. Springs moves for judgment as a matter of law or, alternatively, for a new trial or, alternatively, to alter or amend the judgment.

## BACKGROUND

### 1. Breach Of Promise/The Promise Act

Wildey sued Springs for breach of a promise to marry. At common law, a party may recover damages arising from a broken promise to marry. *See Stanard v. Bolin,* 88 Wash.2d 614, 565 P.2d 94, 96 (1977). The common law action apparently originated from the Seventeenth Century English conception of marriage as chiefly a property transaction. *Id.; see also* H. Clark, *The Law of Domestic Relations in the United States* 2 (1968). The breach of promise action is essentially a breach of contract suit. *See McKee v. Mouser,* 131 Iowa 203, 108 N.W. 228, 229 (1906). Accordingly, to prevail on a breach of promise claim, a plaintiff must establish that a binding contract was entered: that there was an offer, an acceptance, and valid consideration, and that the agreement was free from fraud or duress. *Id.* Mutual promises to marry are considered sufficient consideration to support a binding contract to marry. *See Schultz v. Duitz,* 253 Ky. 135, 69 S.W.2d 27, 28 (1934). The agreement to marry need not be in writing, nor must the parties set out the time and manner of performance (*i.e.,* when and where the wedding is to take place). *See McKee,* 108 N.W. at 229. Although a breach of promise suit is an action on a contract, the damages that may be awarded more closely resemble tort damages. *See Stanard,* 565 P.2d at 96.

In a breach of promise action, the defendant may raise traditional breach of contract defenses. *See O'Neill v. Beland,* 133 Ill.App. 594, 596 (1907). The defendant may present facts that would negate the existence of a valid contract, and he [1] may attempt to establish that the plaintiff failed to comply with a condition precedent. The defendant also may attempt to show that performance would be impossible because one of the parties is infected with an incurable, communicable disease. *See In re Oldfield's Estate,* 175 Iowa 118, 156 N.W. 977, 985 (1916).

In a number of states, the breach of promise action has been abolished.[2] Statutes

---

1. In this opinion, hypothetical defendants are referred to as "he," and hypothetical plaintiffs are referred to as "she."

2. The states that have abolished the action for breach of promise are: Alabama, California, Colorado, Connecticut, Florida, Indiana, Maine, Maryland, Massachusetts, Michigan, Nevada, New

abolishing breach of promise suits are commonly referred to as "heart balm" statutes because they permit the former lovers' heartaches to heal without recourse to the courts. Most heart balm statutes were enacted in the first half of this century. The statutes were not passed, as might be expected, because changing cultural mores had made the breach of promise action anachronistic. Rather, the heart balm statutes were enacted to protect potential defendants from overzealous spurned lovers. The purpose of the heart balm statutes was originally "to avert the perpetration of fraud by adventurers or adventuresses who were prone to use the threat of a breach of promise of marriage action to compel overapprehensive and naive defendants to make lucrative settlements in order to avoid embarrassing and lurid notoriety which accompanied litigation of this character." 12 Am.Jur.2d, *Breach of Promise,* § 18. In other words, the statutes were passed to protect defendants, not to reflect changing societal views of engagement and marriage.[3]

The Florida heart balm statute ("the Florida statute") is representative of other heart balm statutes. Originally passed in 1941, the Florida statute abolishes common law actions for alienation of affections, criminal conversation, seduction, and breach of contract to marry. *See* Fla.Stat.Ann. § 771.01. The Florida statute is based on the legislative finding that those who break engagements may be "free of any wrongdoing ... [and may be] merely the victims of circumstances." *Id.* The preamble declares it to be Florida public policy that the best interests of the people of the state are served by the abolition of the breach of promise action. *Id.*

Hampshire, New Jersey, New York, Pennsylvania, West Virginia, Wisconsin, and Wyoming.

**3.** However, the courts have recognized that heart balm statutes also reflect changes in values regarding the proper role of the courts in private affairs. One early decision noted that the heart balm statutes represent the understanding that "the courts should [not] explore the minds of suitors and determine their sincerity at the moment of proposal of marriage." *A.B. v. C.D.,* 36 F.Supp. 85, 87 (E.D.Pa.), *aff'd,* 123 F.2d 1017

In Illinois, the common law action for breach of promise has not been abolished, but has been modified and limited by the promise act.[4] The promise act limits the damages that may be recovered in breach of promise actions to "actual damages sustained as a result of the injury complained of," and disallows "punitive, exemplary, vindictive or aggravated damages." *See* 740 ILCS 15/2–3. The promise act does not clearly define the scope of actual damages, leaving that issue for determination by the courts. *See Smith v. Hill,* 12 Ill.2d 588, 147 N.E.2d 321, 326–27 (1958). The promise act also bars breach of promise suits in cases in which specified notice requirements have not been satisfied. *See* 740 ILCS 15/4–5. Under Illinois law, common law breach of promise actions may be maintained in a limited form.

## 2. The Wildey–Springs Engagement

Wildey is a Chicago attorney. Springs is a wealthy Oregon cattle rancher. Wildey and Springs are both in their fifties. Wildey is divorced and has three teenage daughters. Springs also is divorced. Wildey and Springs became acquainted through a mutual friend in December 1991. The couple first spoke by telephone, and they first met in person in January 1992, when Springs was visiting Chicago. In the following weeks, Wildey and Springs spoke on the telephone several times. Springs visited Wildey in Chicago in February 1992.

Wildey and Springs' relationship progressed rapidly. During the first week of March 1992, Wildey and Springs spent a week together in Florida. On March 9, 1992, just before they were to return to their respective homes, Wildey and Springs discussed the idea of getting married. Wildey and Springs became engaged that day at the Orlando airport.

(3d Cir.), *cert. denied,* 314 U.S. 691, 62 S.Ct. 361, 86 L.Ed. 553 (1941).

**4.** Illinois originally abolished breach of promise actions by statute. However, the Illinois Supreme Court found that Illinois' heart balm statute violated the Illinois constitution because it robbed plaintiffs of a vested right to sue for damages. *See Heck v. Schupp,* 394 Ill. 296, 68 N.E.2d 464, 466 (1948).

In the next six weeks, Springs visited Wildey in Chicago twice and Wildey visited Springs in Oregon twice. The couple also spent time together in Los Angeles, and often spoke on the telephone. On one of Springs' visits to Chicago, Springs bought Wildey a diamond engagement ring valued at more than $19,000. The couple set a wedding date of June 20, 1992, then later rescheduled the wedding to September 5, 1992. The engagement ended abruptly on April 27, 1992, when Springs wrote Wildey, informing her that he had decided not to marry her.

### 3. Procedural History

In late May and early June 1992, Wildey wrote back to Springs, announcing her intention to sue Springs for breaking the engagement. In October 1992, Wildey filed suit against Springs in the Circuit Court of Cook County, Illinois. Wildey claimed damages for Springs' breach of promise based on: (1) psychiatric costs; (2) lost income; and (3) pain and suffering. Springs removed the action to this court, pursuant to 28 U.S.C. § 1441. After a trial, the jury found for Wildey on all of her claims. The jury awarded Wildey $25,000 for medical costs, $60,000 for lost net business profits, and $93,000 for pain and suffering.

Springs raises a number of challenges to the jury verdict, and moves for judgment as a matter of law or, alternatively, for a new trial. See Fed.R.Civ.P. 50(b), 59(a). Springs contends that Wildey's suit is barred under Florida law—which, he claims, should have been applied in this case. Springs also argues that the suit is barred because Wildey did not meet the notice requirements of the promise act. Springs further asserts that he has established that he was justified in breaking the engagement. Finally, Springs moves to amend the judgment, seeking a reduction of the damages the jury awarded to Wildey. See Fed.R.Civ.P. 59(e).

### DISCUSSION

■ In a diversity suit, the court reviews a motion for judgment as a matter of law under the forum state's law. See *Equity Capital Corp. v. Krieder Transport Service, Inc.*, 967 F.2d 249, 252 (7th Cir.1992). Under Illinois law, the court may enter judgment notwithstanding the verdict only when all evidence and inferences drawn from the evidence, viewed in the light most favorable to the non-movant, "so overwhelmingly favor the movant that no contrary verdict can stand." *Id.* The court reviews a motion for a new trial under federal law. *Trzcinski v. American Casualty Co.*, 953 F.2d 307, 315 (7th Cir.1992). The court may grant a new trial only if the verdict is against the manifest weight of the evidence. *Id.*

### 1. Choice Of Law

#### a. *Comity and unenforceable contracts*

■ Springs challenges the jury verdict on choice of law grounds. Springs asserts that the controlling law is Florida's heart balm statute, which bars breach of promise actions. Illinois courts generally construe contracts according to the law of the state in which they were entered. See *William J. Lemp Brewing Co. v. Ems Brewing Co.*, 164 F.2d 290, 293 (7th Cir.1947), *cert. denied*, 333 U.S. 863, 68 S.Ct. 745, 92 L.Ed. 1142 (1948). If a contract is to be performed in a state other than the state in which the contract was entered, the law of the state of performance governs. *Id.* However, if a contract is void in the state in which it was entered, Illinois courts apply comity principles, and do not enforce the contract at all. See *Frankel v. Allied Mills, Inc.*, 369 Ill. 578, 17 N.E.2d 570, 572 (1938); *Olsen v. Celano*, 234 Ill. App.3d 1045, 175 Ill.Dec. 799, 802–03, 600 N.E.2d 1257, 1260–61 (1992). Springs argues that in this case, the court must apply the comity analysis, and must refuse to enforce the agreement to marry.

Springs notes that the parties became engaged in Florida, a state in which an agreement to marry is not an enforceable contract. Under Florida's heart balm statute, "no contract to marry made or entered into" in Florida may give rise to an action for breach of promise. Fla.Stat.Ann. § 771.04.[5] The

---

**5.** The full text of the relevant portion of the Florida heart balm statute is as follows:

No act hereafter done within this state shall operate to give rise, either within or without

Florida statute is unequivocal and covers suits brought "either within or without" the state of Florida. *Id.* Thus, Springs argues, there is no enforceable agreement for the court to construe; under comity principles, the court may not enforce an agreement to marry that was entered in a state in which the agreement would not be enforceable. Springs concludes that Wildey's suit is barred.

Springs' position is bolstered by two decisions in which courts used a similar comity analysis. In *Hutchins v. Day,* 269 N.C. 607, 153 S.E.2d 132 (1967), the Supreme Court of North Carolina ruled that the defendant must be permitted to present evidence that the contract to marry was entered in California (which had abolished breach of promise actions). In so holding, the *Hutchins* court wrote that:

> a party to a contract made in a State which denied recovery for its breach should not be allowed to recover in another State, although the breach occurred in the forum State ... a contract unenforceable in the State where it is made should not be enforceable in the courts of this State.

*Hutchins,* 153 S.E.2d at 136. Similarly, in *Greco v. Anderson,* 615 S.W.2d 429 (Mo. 1980), the Missouri Court of Appeals upheld the dismissal of a suit for breach of promise and seduction. In reaching its decision, the *Greco* court reasoned that the promises and seduction had occurred in Massachusetts, a state that does not support an action for breach of promise or seduction. *See Greco,* 615 S.W.2d at 432.

Both of these decisions would support Springs' position that the court must refuse to enforce the agreement because it would be unenforceable in Florida—if the agreement indeed was entered in Florida. The parties have stipulated that Wildey and Springs became engaged in Florida, on March 9, 1992. *See* Pretrial Order ¶ A.7. Springs contends that by becoming engaged in Florida, the parties made or entered a contract to marry in Florida. In response, Wildey concedes

that the parties became engaged in Florida, but contends that the contract to marry was not consummated until the parties later purchased an engagement ring and set a wedding date in Illinois. Thus, Wildey maintains that there is a substantive difference between an engagement and an agreement to marry.

### b. *What is an agreement to marry?*

As Wildey's response demonstrates, Springs' choice of law argument is premised on the legal position that an agreement to marry is identical to an engagement. The crux of Springs' argument is that he and Wildey entered a contract to marry at the moment that they became engaged. At this late stage of the case, the court cannot rule on the narrow legal question that Springs' argument raises. Springs properly should have raised this legal point via a motion to dismiss or a motion for summary judgment. Instead, Springs waited until the middle of trial to raise the issue of the legal effect of the engagement. Before trial, Springs did not raise as a pure legal question whether an engagement is or is not an agreement to marry. At this juncture, it is impossible to separate out the legal question from the factual issues presented to the jury.

Because the court was not asked before trial to rule on the effect of the engagement, it is impossible to rule as a matter of law that the agreement to marry took place in Florida when the parties became engaged. The court may set aside a jury verdict only if "there is no legally sufficient *evidentiary* basis for a reasonable jury" to have reached its verdict. Fed.R.Civ.P. 50(a) (emphasis added). Springs does not challenge the sufficiency of the evidence. Springs' motion to set aside the jury verdict on choice of law grounds amounts to an untimely motion to dismiss and cannot be granted as a Rule 50 motion for judgment as a matter of law or a Rule 59 motion for a new trial. The court's choice of law determination will not be disturbed.[6]

---

this state, to any of the rights of action abolished by law. No contract to marry made or entered into in this state shall operate to give

rise, either within or without this state, to any cause of action for the breach thereof. Fla.Stat.Ann. § 771.04.

**6.** At trial, the court found that Illinois has the

## 2. Notice Under The Promise Act

Springs contends that Wildey's action fails because her written notice of suit did not state the date that Wildey and Springs had agreed to be married. Springs further argues that the court incorrectly instructed the jury on the standard of notice under the promise act.

Under the promise act, a plaintiff in a breach of promise suit must, within three months of the breach, notify the defendant in writing of her intention to file suit. *See* 740 ILCS 15/4. The written notice must contain the following four elements:

(1) the date upon which the promise or agreement to marry was made;

(2) the date upon which the wedding was to take place;

(3) the damages suffered; and

(4) whether the person intending to sue is still willing to marry the defendant.

*Id.* An action for breach of promise is barred if the plaintiff fails to comply with the statutory notice requirements. *Id.* at 15/5.

Springs contends that Wildey's suit is barred because she did not satisfy each of the promise act's four notice requirements. Springs also asserts that the court erred by instructing the jury that substantial compliance with the notice provision as a whole is sufficient to satisfy the promise act. The gravamen of Springs' argument is that under the promise act, each of the four notice elements must be independently satisfied or else a breach of promise suit fails. Springs maintains that substantial compliance with the notice requirements is insufficient if any of the four elements of notice is altogether lacking. Springs has raised this precise argument twice before—and it was rejected each time.

In moving to dismiss the complaint, Springs argued that Wildey had not sufficiently alleged that she had satisfied the notice requirements of the promise act. The court denied the motion. The court followed Illinois Supreme Court precedent in holding that, "in construing notice requirements ... most significant contacts to the action. *See* Restatement (Second) Conflicts of Law, § 188. Accordingly, the court ruled that Illinois law must be applied.

courts must look to substance, rather merely to form," and found that courts must construe statutory notice requirements "to prevent obvious injustices." Memorandum Opinion and Order, No. 92 C 8146 (N.D.Ill. Jan. 27, 1993) at 5–6 (citing and paraphrasing *White v. Prenzler*, 7 Ill.2d 624, 131 N.E.2d 540, 543 (1956)). The court concluded that Wildey's allegations of compliance with the notice provisions were sufficient to withstand a motion to dismiss.

Springs moved to reconsider the court's decision. Springs argued that as a matter of law, substantial compliance with the notice provisions of the promise act is insufficient if any of the notice requirements have not been met. The court denied Springs' motion for reconsideration. The court reiterated that substantial compliance with the notice requirement as a whole is sufficient to satisfy the promise act. The court again found that Wildey's allegations could support a finding of substantial compliance with the notice provisions—especially in light of Springs' actual notice that the agreement to marry had taken place. *See* Memorandum Opinion and Order, No. 92 C 8146 (N.D.Ill. Feb. 11, 1993). In the two previous decisions, the court has concluded that under the promise act, Wildey was required to satisfy the substance, not the letter, of the promise act's notice provision.

Springs' post-trial challenge raises the identical question: For the third time, Springs contends that substantial compliance is insufficient under the promise act's notice provision. For the third time, the court finds Springs' argument to be untenable in light of the Illinois Supreme Court's holding in *White v. Prenzler*, 7 Ill.2d 624, 131 N.E.2d 540 (1956). Because substantial compliance with the promise act's notice requirement is sufficient, Wildey's suit does not fail as a matter of law. For the same reason, the notice instruction that the court gave the jury was sound.

## 3. Excuse From Performance

Springs argues that he was legally justified in breaking the engagement.

Springs notes that there was undisputed evidence at trial that Wildey suffers from compulsive personality disorder.[7] Springs maintains that he was unaware of Wildey's mental condition when they became engaged. Springs asserts that he is excused from performing on the agreement to marry in light of Wildey's condition. Springs moves for judgment as a matter of law and moves alternatively for a new trial because the court refused his tendered jury instruction that a contract to marry may be set aside if the plaintiff has a mental disorder of which the defendant was unaware when the agreement to marry was entered.

■ An agreement to marry, "being subject to the implied condition that the parties shall remain in a state of health which will permit the consummation of the marriage without endangering the health of the parties or the offspring," may be set aside if, at the time of entering the agreement, one of the parties has a debilitating disease of which the other party is unaware. *See* Am.Jur.2d, *Breach of Promise,* § 23; *Kantzler v. Grant,* 2 Ill.App. 236, 239 (1878) (breach is justified if other party has venereal disease). Springs argues that Wildey's alleged personality disorder, of which, he claims, he was unaware when the agreement to marry was entered, is sufficient to justify breaching the agreement. Springs argues pointedly, "that a person may not be liable for breaking an engagement if his fiance secretly suffers from a serious mental disorder which could take years of psychotherapy to cure." Motion at 7.

Springs' argument is unpersuasive. Although an agreement to marry generally may be set aside if one of the parties has a disease, this rule does not apply when a party has a disease that is temporary or which merely "render[s] a party less capable of discharging the duties of the marital relation." *See* Am.Jur.2d, *Breach of Promise,* § 23; *Shackleford v. Hamilton,* 93 Ky. 80, 19 S.W. 5, 7–8 (1892). In essence, a party is excused from performance only if the disease is fairly permanent and would truly interfere

with the physical relations between the parties. *See Shackleford,* 19 S.W. at 6–8. In this case, it is clear that Wildey's alleged mental disorder is curable and would not interfere with the physical or emotional aspects of marriage.

There was testimony that Wildey suffers from obsessive compulsive personality disorder. As Springs concedes, this personality disorder is curable through psychotherapy. It is not a disorder that would make marriage impossible. Obsessive compulsive disorder would not make Wildey unable to "discharg[e] the duties of the marital relation." People with obsessive compulsive disorder are not "diseased" in a common sense of the word. They tend toward perfectionism in their daily lives, may be indecisive, and suffer from generalized anxiety symptoms. *See* DSM–III–R at 356. Although these character traits may be undesirable or painful, they are chiefly a problem for the person suffering from the disorder. They do not amount to a disease that would interfere with a successful marriage.[8]

■ Springs' contention that he must be excused from performance in light of Wildey's mental condition fails in light of the diagnostic purposes of DSM–III–R. In an introductory statement, the authors of DSM–III–R caution that:

> the clinical and scientific considerations that were the basis of DSM–III–R classification and diagnostic criteria may not be relevant to consideration in which DSM–III–R is used outside clinical or research settings, *e.g.,* in legal determinations.

DSM–III–R at xxvi. In other words, DSM–III–R's diagnostic labels are for furthering psychiatric research and facilitating treatment, and cannot be directly applied to legal settings. The diagnoses do not represent diseases in the legal sense of the word. Springs' argument that Wildey has a disease which justifies breaking the engagement is

---

7. The correct diagnosis is obsessive compulsive personality disorder. *See Diagnostic and Statistical Manual of Mental Disorders* (3d ed. rev'd) at 354–56 (hereinafter "DSM–III–R").

8. Nor are they character traits that Springs realistically could have overlooked in the four months that he was romantically involved with Wildey.

without merit.[9] Springs' motion for judgment as a matter of law or for a new trial based on Wildey's mental condition must be denied.

### 4. Remittitur

Springs moves in the alternative to alter or amend the judgment. *See* Fed.R.Civ.P. 59(e). Springs contends that the court must amend the judgment to reduce the damages the jury awarded to Wildey.

#### a. *Pain and suffering*

 Springs maintains that the jury was not justified in awarding Wildey $93,000 based on Wildey's past and future pain and suffering.[10] Under the promise act, damages are "limited to the actual damages sustained as a result of the injury complained of." 740 ILCS 15/2. Accordingly, "no punitive, exemplary, vindictive or aggravated damages shall be allowed" in a breach of promise action under the promise act. 740 ILCS 15/3. The promise act does not define the phrase "actual damages." Nevertheless, Springs argues that pain and suffering damages are too indefinite to be included within the meaning of actual damages.

At common law, damages in breach of promise actions are akin to tort damages. *See Stanard v. Bolin,* 88 Wash.2d 614, 565 P.2d 94, 96 (1977). However, the promise act limits the damages available in a breach of promise action. In passing the promise act, the Illinois General Assembly "declared that the award of monetary damages in [breach of promise] actions is ineffective as a recompense for genuine mental or emotional distress." 740 ILCS 15/1. Springs contends that this legislative pronouncement suggests that the statute originally was intended not to permit damages for pain and suffering. He argues that the entire purpose of the promise act is to prohibit inflated, indefinite damages awards. Springs' reading of the promise act is belied by Illinois case law.

In *Smith v. Hill,* 12 Ill.2d 588, 147 N.E.2d 321 (1958), the Illinois Supreme Court held that under the promise act a plaintiff:

> is entitled to ... a cause of action for damages actually sustained when he has suffered injury.... [The promise act] does not take away the cause of action for breach of promise or the right to damages actually sustained by the aggrieved party.

*Smith,* 147 N.E.2d at 325. Accordingly, the court found that two counts of a complaint containing allegations of humiliation and degradation stated a claim for relief. *Id.*[11] In *Smith,* the Illinois Supreme Court held that a plaintiff may recover any damages "actually sustained" by a breach of promise, including mental suffering and humiliation. Under *Smith,* damages for pain and suffering may be awarded in a breach of promise case as long as they are meant to compensate the plaintiff for actual damages suffered and are not meant to punish the defendant or inflate the recovery. Thus, under Illinois law, pain and suffering damages are not too indefinite to be awarded consistently with the promise act.[12]

---

9. Springs' argument that he was justified in ending the engagement because Wildey has a disease amounts to the use of a psychiatric label to support his real reason for ending the engagement: he simply changed his mind about whether Wildey would be a desirable spouse. It is immaterial whether Springs is able to pin a label on Wildey to describe why he no longer wants to marry her—in light of the promise act, which preserves a common law action against those who change their minds after agreeing to marry. *See also Heck v. Schupp,* 394 Ill. 296, 68 N.E.2d 464, 466 (1946) (person has vested right under the Illinois constitution to sue for damages caused by breach of promise to marry).

10. The jury awarded Wildey $57,000 for pain and suffering from the date of termination of engagement to the date of entry of judgment and awarded Wildey $36,000 for future pain and suffering.

11. The *Smith* court nevertheless upheld the lower court's decision striking these counts of the complaint in light of their allegations of seduction, which is not compensable. *See Smith,* 147 N.E.2d at 325.

12. Springs' reliance on *Coulter v. Renshaw,* 94 Ill.App.3d 93, 49 Ill.Dec. 635, 418 N.E.2d 489 (1981), is misplaced. In *Coulter,* the court found that damages for loss of consortium would be too indefinite under the Alienation of Affections Act, 740 ILCS 5/1, *et seq.* ("the affections act"). However, the affections act, unlike the promise act, explicitly prohibits damages based on "mental anguish suffered by the plaintiff [or] any injury to the plaintiff's feelings." 740 ILCS 5/4.

In this case, Wildey presented ample evidence of her actual pain and suffering. Based on this evidence, the jury decided that Wildey must be compensated for her mental pain. Springs does not attempt to show that the jury's award was tainted by passion or prejudice or was clearly excessive. There is no reason to conclude that the jury wished to punish Springs or to inflate the damages it awarded to Wildey. Accordingly, it is not proper to alter the judgment by reducing the damages awarded for pain and suffering.

### b. *Net lost profits*

■ The jury awarded Wildey $60,000 for net lost business profits.[13] Springs asserts that there was insufficient evidence from which the jury could have calculated Wildey's lost business profits. Springs also contends that Wildey did not prove a causal link between the broken engagement and her loss of business income. Upon reviewing the evidence upon which the jury based its award of net lost profits, it is clear that Springs' causation argument is well-founded.

Undisputed evidence was presented that Wildey lost her major client during the time that Wildey and Springs were engaged and shortly thereafter. Wildey admitted on the witness stand that the broken engagement did not cause her to lose that client. Thus, it was undisputed that Wildey's legal practice was failing before Springs ended the engagement. Wildey based her claim for net lost profits on the fact that she lost her client in reliance on Springs' assurances that he would take care of her financially—before and after their marriage. Wildey introduced evidence to support her contention. Wildey therefore contended that Springs is liable for her net lost profits because she lost her client in reliance on his assurances. The jury apparently awarded Wildey net lost business profits based on this damages theory. However, no evidence was presented to support a finding that Springs' breach of promise to marry directly caused Wildey to lose business income.

As a matter of law, Wildey's evidence is insufficient to support a finding that the broken engagement caused her to lose net business profits. Under the promise act, Wildey may recover the "actual damages" she sustained as a result of the breach. *See* 740 ILCS 15/2. In this case, Wildey sustained no actual damages to her legal practice as a result of the breach. Wildey claims to have lost legal business while she was engaged to Springs and blames Springs' conduct for the reversals in her legal practice. Although Springs may have promised to take care of Wildey financially, and Springs' promise may have induced Wildey to take risks that caused her legal practice to suffer, Wildey does not sue Springs for a broken financial promise. Rather, Wildey sues Springs for breaking the engagement.

Wildey may only recover actual damages resulting from Springs' breaking the engagement. Because Wildey presented no evidence to support a reasonable inference that the broken engagement caused Wildey's legal practice to fail, she cannot recover damages for her net lost business profits. Accordingly, the damages awarded by the jury must be reduced by $60,000.

### c. *Medical expenses*

■ The jury awarded Wildey $25,000 in medical expenses.[14] Springs argues that there was insufficient evidence upon which to support an award of future medical expenses. Springs further asserts that because Wildey was already depressed before Springs ended the engagement, there was insufficient evidence that the breach of promise to marry caused any of Wildey's medical expenses. Springs concludes that the award of medical expenses provides Wildey with a windfall.

Springs' argument regarding future medical expenses is based on the premise that

---

Cases construing the affections act, such as *Coulter*, clearly are inapposite.

13. The jury awarded Wildey $40,000 for lost net business profits from the date of the termination of engagement to the date of entry of judgment and $20,000 for future lost net business profits.

14. The jury awarded Wildey $7,000 for medical expenses from the date of the termination of engagement to the date of entry of judgment and $18,000 for future medical expenses.

"once Wildey was cured of her depression [sic] episode, she was returned to her condition prior to the broken engagement." Motion at 12. Springs concludes that any future psychotherapy would be "to explore the 'childhood causes of her depression.'" *Id.* Clearly the jury did not agree with Springs' assessment of Wildey's mental condition. The jury came to the opposite, although equally reasonable conclusion, that in the coming three years Wildey will continue to suffer the psychological consequences of the broken engagement, and she will require therapeutic intervention. Whether the focus of psychotherapy will be on Wildey's childhood is immaterial to the cause of Wildey's depression—which the jury found to be the broken engagement. The award of future medical damages is supported by the evidence.

Springs' contention that the breach of promise did not cause any of Wildey's medical costs is equally unpersuasive. Springs attacks the credibility of Wildey's expert witness, Dr. Litowitz. In particular, Springs notes certain inconsistencies between Dr. Litowitz' and Wildey's testimony. Regardless of these minor inconsistencies, the jury was entitled to give credence to the essence of Dr. Litowitz' testimony and to conclude that the broken engagement caused Wildey to seek psychiatric care. The award of past medical damages is reasonable and is supported by the evidence.

#### d. *Recoupment and set off*

Springs argues that the damages award must be reduced by $16,000 to compensate him for money he already has paid Wildey. While Wildey and Springs were still engaged, Wildey withdrew $6,000 from Springs' bank account and wrote the word "loan" on the check that she used to make the withdrawal. Springs maintains that the $6,000 must be set off because Wildey continues to owe Springs for the $6,000 loan. In addition,

upon breaking the engagement, Springs suggested that Wildey withdraw another $10,000 from his bank account. Springs contends that the $10,000 must be deducted from the damages because he gave Wildey this money in reparation for breaking the engagement.

Springs cites no authority to support his claim that he must be repaid for the money Wildey withdrew from Springs' account. Springs simply asks the court to deduct $16,000 from the damages awarded for money he claims he is owed. Regarding the $6,000 that Wildey withdrew from Springs' account during the engagement, there has been no finding that this sum was a loan for which Springs is now entitled to recoupment or set off.[15] The court cannot award Springs this money merely because he claims Wildey owes it to him. As for the $10,000 that Springs gave Wildey as reparation for breaking the engagement, Springs cites no cases to support his position that the money must be returned to him now that Wildey has prevailed in a breach of promise suit. *Cf.* Memorandum Opinion and Order, No. 92 C 8146 (N.D. Ill. Sept. 3, 1993) 5–8 (Springs' offer of $10,000 did not amount to accord and satisfaction of the suit). Springs' claim that the court must simply deduct $10,000 from the damages is untenable. For these reasons, the damages need not be reduced by the amount Wildey withdrew from Springs' bank account.

### CONCLUSION

For the foregoing reasons, defendant Richard Springs' motion for judgment as a matter of law or, alternatively, for a new trial or, alternatively to alter or amend the judgment is granted in part and denied in part. The damages awarded by the jury in the amount of $178,000 are reduced to $118,000.

---

15. The jury was not instructed on recoupment or set off. Springs argues that his tendered jury instruction on recoupment and set off was not given because Wildey agreed to permit the court to reduce the damages awarded after trial. In response, Wildey states that she objected to Springs' instruction as vague and legally unsound, and she suggested that the court could devise a proper instruction. The court did rewrite Springs' instruction, but Springs objected to the revision. Accordingly, no instruction was given. After refusing the court's compromise jury instruction, Springs cannot now complain that the jury did not find that the $6,000 was a loan.